1  ROBERT W. FREEMAN
   Nevada Bar No. 3062
2  Robert.Freeman@lewisbrisbois.com
   E. MATTHEW FREEMAN
3  Nevada Bar No. 14198
   Matt.Freeman@lewisbrisbois.com
4  LEWIS BRISBOIS BISGAARD & SMITH LLP
   6385 S. Rainbow Boulevard, Suite 600
5  Las Vegas, Nevada 89118
   702.893.3383
6  FAX: 702.893.3789
   *Attorneys for Defendant*
7  *City of North Las Vegas*

8              **UNITED STATES DISTRICT COURT**

9          **DISTRICT OF NEVADA, SOUTHERN DIVISION**

10                          ***

11 MARIAH MAAS, as Special Administrator       CASE NO. 2:22-cv-568-GMN-DJA
   for the Estate of Tiffany Slatsky, MARTIN
12 SLATSKY, as parent and legal guardian of    **CITY OF NORTH LAS VEGAS' MOTION**
   CADE SLATSKY, a minor, MARTIN               **FOR SUMMARY JUDGEMENT**
13 SLATSKY,

14              Plaintiffs,

15      vs.

16 CHRISTOPHER CANDITO, an individual,
   ANDREW CLAPPER, an individual,
17 NICHOLAS ROBISON, an individual,
   ANDREW STOCKER, an individual, CITY
18 OF NORTH LAS VEGAS, a municipality;
   DOE DEFENDANTS I through XX, and ROE
19 CORPORATIONS I through X, inclusive,

20              Defendants.

21

22

23

24

25

26

27

28

159339469.1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   STATEMENT OF UNDISPUTED FACTS ............................................................1

    A.   Detective Calvano's Investigation.....................................................................2

        1.   The Golden Nugget Track Suit Party...........................................2

        2.   Candito and Slatsky's activities after the party. ...........................3

        3.   Ms. Slatsky's lethal overdose.......................................................3

    B.   Clark County Coroner's Report and Candito's actions the night before Ms. Slatsky's death..........................................................................3

        1.   Conclusion of criminal investigation. ..........................................6

    C.   The City of North Las Vegas played no part in Ms. Slatsky's death. .......................6

II.   SUMMARY JUDGMENT STANDARD ............................................................7

III.  LEGAL ARGUMENTS .......................................................................................9

    A.   The City of North Las Vegas cannot be held vicariously liable both because there is no respondeat superior liability in the civil rights context, but also because Candito failed in his attempt to require the City of North Las Vegas to indemnify him. ..................................................................9

    B.   CNLV is not liable for a civil rights violation as a municipality. ....................10

        1.   CNLV Defendants maintained sufficient policies and procedures relevant to Plaintiffs' claims. .......................................11

        2.   Defendant EMTs, including Candito, were appropriately trained by CNLV. ...................................................................15

        3.   CNLV did not ratify unconstitutional conduct.............................20

    C.   CNLV is not liable for the conduct of Christopher Candito because he was not acting within the course and scope of his employment at any time relevant to Plaintiffs' causes of action and CNLV is not vicariously liable for his behavior..............................................................25

    D.   Candito was not acting under color of state law at any time relevant to Plaintiff's causes of action. ...........................................................31

IV.   CONCLUSION ...............................................................................................33

V.    EXHIBIT(S) ....................................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adickes v. S.H. Dress & Co.*,
  398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ........................................................ 8

*Alexander v. City and County of San Francisco*,
  29 F.3d 1355 (9th Cir. 1994)..................................................................................................... 16

*Anderson v. Warner*,
  451 F.3d 1063 (9th Cir. 2006) ................................................................................................. 31

*Blankenthorn v. City of Orange*,
  485 F.3d 463 (9th Cir. 2007) .................................................................................................... 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986) ........................................................ 8

*City of Canton v. Harris*,
  489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ......................................... 10, 15, 16

*City of Oklahoma City v. Tuttle*,
  471 U.S. 808, 105 S.Ct. 2427, 85 L. Ed. 2d 791 (1985) .................................................. 12, 15

*Clouthier v. County of Contra Costa*,
  591 F.3d 1232 (9th Cir. 2010) ................................................................................................. 10

*Connick v. Thompson*,
  563 U.S. 51, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011) ....................................................... 15

*Davis v. City of Ellensburg*,
  869 F.2d 1230 (9th Cir. 1989)............................................................................................ 12, 16

*The State of Nevada v. Christopher Neal Candito*,
  Case No. C-21-357975-1 ............................................................................................................ 6

*Gillette v. Delmore*,
  979 F.2d 1342 (9th Cir. 1992)................................................................................................... 12

*Gravelet-Blondin v. Shelton*,
  728 F.3d 1086 (9th Cir. 2013)............................................................................................ 11, 21

*Gritchen v. Collier*,
  254 F.3d 807 (9th Cir. 2001)..................................................................................................... 31

*Hechavarria v. City & Cnty. of S.F.*,
  463 Fed. Appx. 631 (9th Cir. 2011) ......................................................................................... 32

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Huffman v. Cnty. of L.A.*,
    147 F.3d 1054 (9th Cir. 1998) ............................................................................ 32

*Johnson v. Duffy*,
    588 F.2d 740 (9th Cir. 1978) .............................................................................. 9

*Kentucky v. Graham*,
    473 U.S. 159, 105 S.Ct. 3099, 87 L. Ed. 2d 114 (1985) ...................................... 12

*Lessard v. Applied Risk Management*,
    2002 U.S. App Lexis 20810 (9th Cir. October 3, 2002) ........................................ 8

*Lockett v. City of Los Angeles*,
    977 F.3d 737 (9th Cir. 2020) .............................................................................. 11

*Long v. County of Los Angeles*,
    442 F.3d 1178 (9th Cir. 2006) ............................................................................ 11

*Madrid v. County of Apache*,
    289 Fed. Appx. 155 (9th Cir. 2008) .................................................................... 25

*Matsushita Elec. Indust. Co., Ltd. V. Zenith Radio Corp.*,
    475 U.S. 574, 89 L. Ed. 2d 538, 106 S.Ct. 1348 (1986) ...................................... 8

*McDade v. West*,
    223, F.3d 1135, 1141 (9th Cir. 2000) ................................................................. 12

*Merritt v. County of Los Angeles*,
    875 F.2d 765 (9th Cir. 1989) .............................................................................. 16

*Monell v. Department of Social Servs.*,
    436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ......................... 9, 10, 11, 15

*Moore v. Villanueva*,
    2019 U.S. Dist. LEXIS 230719 (C.D. Cal. 2019) ................................................ 31

*Munger v. City of Glasgow Police Department*,
    227 F.3d 1082 (9th Cir. 2000) ............................................................................ 11

*Nadell v. Las Vegas Metropolitan Police Dept.*,
    268 F.3d 924 (9th Cir. 2001) .............................................................................. 12

*Oki Semiconductor Co. v. Wells Fargo Bank*,
    298 F.3d 768 (9th Cir. 2002) .............................................................................. 25

*Paine v. City of Lompoc*,
    265 F.3d 975 (9th Cir. 2001 ................................................................................ 9

*Palmer v. Sanderson*,
    9 F.3d 1433 (9th Cir. 1993) ................................................................................ 9

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1
2

*Pembaur v. City of Cincinnati*,
    475 U.S. 469, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986) ....................................... 11

3
*Rizzo v. Goode*,
    423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) ........................................... 9

4
5
*Rodriguez v. Cnty. Of Los Angeles*,
    891 F.3d 776 (9thCir. 2018) ............................................................................... 11, 20

6
*Sanders v. Kennedy*,
    794 F.2d 478 (9th Cir. 1986) ................................................................................... 9

7
8
*Scott v. Harris*,
    550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ....................................... 8

9
10
*Securities and Exchange Commission v. Seaboard Corporation*,
    677 F.2d 1289 (9th Cir. 1982) ................................................................................... 8

11
*Trevino v. Gates*
    99 F3d 911,918 (9th Cir. 1996) .............................................................................. 12

12
13
*Van Ort v. Estate of Stanewich*,
    92 F.3d 831 (9th Cir. 1996) ..................................................................................... 32

14
15
*Warren v. City of Carlsbad*,
    58 F.3d 439 (9th Cir. 1995) ....................................................................................... 8

16
*Zoslaw v. MCA Distributing Corp.*,
    693 F.2d 870 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983)...................... 7, 8

17
**Statutes**

18
42 U.S.C. §1983 ................................................................................. 9, 11, 16, 31

19
20
NRS 200.010 ................................................................................................... 2

21
NRS 200.508 ................................................................................................... 2

22
NRS 205.060 ................................................................................................... 2

23
NRS 453.336 ................................................................................................... 2

24
NRS 453.401 ................................................................................................... 2

25
NRS §§ 41.0339, 41.0349 ............................................................................. 10

26
**Other Authorities**

27
Federal Rules of Civil Procedure Rule 56(c) ................................................. 7

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Nevada Constitution ................................................................................................ 7, 10, 13

United States Constitution ............................................................................................. 13

## CITY OF NORTH LAS VEGAS' MOTION FOR SUMMARY JUDGEMENT

COMES NOW Defendant CITY OF NORTH LAS VEGAS ("CNLV"), by and through its counsel, Robert W. Freeman, Esq., and E. Matthew Freeman, Esq., of LEWIS BRISBOIS BISGAARD & SMITH, LLP, and hereby submits its Motion for Summary Judgment. The motion is comprehensive and addresses each of Plaintiffs' claims.

Tiffany Slatsky's tragic and untimely death underpins each of Plaintiffs' claims against the City of North Las Vegas, *but* the City played no part in it. Ms. Slatsky died as a result of a drug overdose. She took unprescribed and illegally obtained morphine in the privacy of her own home. Her husband, Defendant Christoper Candito, instead of securing her professional medical treatment, took her to his firehouse where he stole Narcan and administered it to her in a parking lot down the street. Afterward, the couple returned to their home where they continued to drink alcohol and take more illegal drugs. Ms. Slatsky succumbed to the ingested narcotics sometime during the early morning hours of February 23, 2020. After Ms. Slatsky's death Defendant Candito became the subject of several criminal and administrative investigations. He was charged with serious offenses, including murder, drug trafficking, burglary, conspiracy, and child endangerment. Later, he pleaded guilty to Voluntary Manslaughter and served time in the custody of the Nevada Department of Corrections.

In this lawsuit, Plaintiffs claim that the death of Tiffany Slatsky was caused in part by the City of North Las Vegas and filed suit against CNLV for violation of their constitutional rights and state law torts. The City has no responsibility for this tragic event.

This motion is made and based upon the following memorandum of points and authorities as well as the papers and pleadings on file herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF UNDISPUTED FACTS

This matter arises out of the tragic death of Tiffany Slatsky from a morphine overdose on February 23, 2020. Due to the circumstances of Ms. Slatky's death, criminal investigations were performed by both the City of Henderson (into the cause and manner of Slatsky's death) and the United States Drug Enforcement Agency (into the use and distribution of illegal narcotics).

A.      **Detective Calvano's Investigation.**

Detective Nathan Calvano of the City of Henderson Police Department investigated Tiffany Slatsky's death and gave his deposition on December 20, 2023.  During his deposition, Detective Calvano described the criminal investigation which included crime scene analysis, narcotic testing, and witness interviews, among other things.  Detective Calvano also authenticated the records included in the City of Henderson Police Department investigative file.  *See Deposition Transcript of Detective Nathan Calvano, at p. 18, ll. 5-22*, attached hereto as **Exhibit A**.  The criminal investigation culminated in the preparation of a Declaration of Warrant for the arrest of Christopher Candito which was prepared by Detective Calvano and dated June 30, 2021.  The Warrant describes the circumstances of Candito's arrest for Murder in violation of NRS 200.010,  Conspiracy to Violate Uniformed Controlled Substances Act in violation of NRS 453.401 (1A),  Possession of a Controlled Substance in violation of NRS 453.336 (1A), Burglary in violation of NRS 205.060 (1b & 2b), and Child Endangerment in violation of NRS 200.508 (1A (2).  *See Declaration of Warrant/Summons*, attached hereto as **Exhibit B.**

1.      **The Golden Nugget Track Suit Party.**

During the course of his investigation Detective Calvano learned that on February 21, 2020, Christopher Candito, and his wife Tiffany Slatsky attended a birthday party hosted by a fellow firefighter at the Golden Nugget Hotel and Casino in Las Vegas, Nevada.  In the weeks prior to the party, Candito exchanged numerous text messages and Venmo transactions with others regarding the procurement and distribution of various controlled substances, including Kadian 60mg morphine capsules, synthetic anabolic steroids, MDMA, cocaine, psilocybin (mushrooms, shrooms), ketamine, oxycodone, Trenbolone, and Xanax.  Detective Calvano found that the illegal and illicit drugs were obtained with the explicit intent of being distributed and made available to individuals attending the party. During the conversations between Candito and others, the actual words "morphine 60mg pills", "morphine" and "Kadian" were used to describe the narcotics Candito purchased.  In addition, the text message exchanges often included photos of the narcotics including the pink colored Kadian morphine capsules that ultimately killed Tiffany Slatsky. …

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

2. **Candito and Slatsky's activities after the party.**

2

Detective Calvano learned that during the morning of February 22, 2020, the party began

3

to wind down and Kayla Szabo, a close friend and co-worker of Tiffanly Slatsky, came to the

4

Golden Nugget to provide a ride to Candito and Slatsky (who were impaired) back to their

5

residence in Henderson, Nevada. When they got back home, Candito, Slatsky, and Szabo

6

continued to drink alcohol, and they remained under the influence of various controlled substances

7

throughout the day. *See Deposition Transcript of Christopher Candito, at p. 127, l. 25 – p. 130, ll.*

8

*1-12,* attached hereto as **Exhibit C**.

9

According to recorded body camera statements, Candito explained to law enforcement that

10

Slatsky took three or four morphine tablets between 5:00 and 6:00 pm that day and afterwards,

11

began to slur her words and act strangely. Candito concluded that Slatsky was "overdosing" so

12

around 10 pm he drove her to North Las Vegas Fire Station 51, located at 2626 E. Carey Avenue,

13

North Las Vegas, Nevada, which was approximately twenty-three miles away. Once at the

14

station, Candito, entered the Firehouse with the intent to steal Narcan and other medical supplies.

15

After he did so, Candito administered Narcan to Slatsky in a parking lot down the street in order to

16

conceal her physical condition from licensed and on duty medical personnel inside the building.

17

Candito stated that after getting the Narcan, Slatsky appeared to be "fine" and so he took her home

18

where they continued to drink alcohol and probably ingested more illegal drugs.

19

3. **Ms. Slatsky's lethal overdose.**

20

On the morning of February 23, 2020, Henderson Police Communications received a 911

21

call from Kayla Szabo who advised her friend Tiffany Slatsky was unconscious and not breathing.

22

Henderson Fire Department Rescue was dispatched and responded to the scene. Upon arrival,

23

Henderson Fire Department Emergency Medical Services encountered Candito carrying Slatsky

24

outside, and subsequently placing her on the curb before beginning chest compressions. The

25

efforts of the emergency medical care providers were not sufficient to save Tiffany Slasky's life.

26

B. **Clark County Coroner's Report and Candito's actions the night before Ms.**

27

**Slatsky's death.**

28

On the same date, Clark County Coroner Investigator Tiffany Brown met with Candito

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   who gave her a voluntary statement.  Candito told Investigator Brown that he and Slatsky went to

2   a party at the Golden Nugget Hotel and Casino on the night of February 21, 2020.  Candito told

3   Brown that when they went to the party Slatsky seemed to be fine with no complaints.  Candito

4   told Brown that they were drinking all night and that Slatsky did two lines of cocaine and took two

5   ecstasy pills while at the party.  Candito told Brown that they stayed at the party all night long and

6   were driven home by Kayla Szabo, who picked them up at approximately 6:00 am.  Once they got

7   home, Candito said they continued to drink and "hang out".  Candito said that Slatsky later began

8   complaining of chest pain and he advised her to take morphine as that is what she normally did

9   when she had chest pain due to acid reflux.  Candito said that not long after Slatsky took the

10  morphine she began slurring her words and he suspected she was overdosing.  Candito tried to get

11  her to eat some food thinking that would help, but when it did not, he drove her to North Las

12  Vegas Fire Station 51 to get Narcan.  Candito told Brown that he chose to drive to the fire station

13  rather than go to a hospital or call 911, because the hospitals would not have taken Slatsky as she

14  was still breathing, still had a pulse and was aroused when he rubbed her leg.  **Exhibit C**, at p.

15  130, ll. 20-25 – p. 131, ll. 15-17; p. 206, ll. 18-25 – p. 207, ll. 1-9; *see also Clark County Coroner*

16  *Report*, attached hereto as **Exhibit D**.

17          Candito said that when they arrived at Fire Station 51, he left Slatsky in his truck and went

18  inside to get Narcan.  Candito told Brown that after he gave Slatsky Narcan she appeared to be

19  normal so they returned to their apartment and since they were all feeling better, began drinking

20  alcohol again.  Candito told Brown that the three adults went to sleep a few hours later and when

21  he woke, he found Slatsky nonresponsive.

22          On March 16, 2020, the Clark County Coroner's Office autopsy and toxicology report was

23  provided to Detective Calvano and others.  Included in the report was a toxicity analysis of Slatsky

24  whose cause of death was described as the result of multiple drug intoxication, including MDMA,

25  morphine, phentermine, etizolam, cocaine and zolpidem.

26          During the course of the criminal investigation, a certified medical expert, Michael Levine

27  MD, FACEP, FACMT, was retained to independently review the case involving Tiffany Slatsky's

28  death.  Dr. Levine concluded that Ms. Slatsky died from morphine toxicity and the other drugs in

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                           4

1   her system were not the cause of her death.

2       This opinion that Tiffany Slatsky died as result of morphine intoxication is shared by

3   CNLV retained expert witnesses. Michael Curtis, M.D., is an expert in emergency medicine and

4   has received extensive training in toxicology. He was board certified in emergency medicine and

5   has treated many patients with toxicological problems, particularly opioid overdoses. He is

6   certified as a medical review officer by the Medical Review Officer Certification Council. The

7   fount of knowledge of a Medical Review Officer includes understanding of the pharmacology and

8   toxicology of drugs of abuse and prescription medications, including opioids, benzodiazepines,

9   amphetamines, cocaine and others. Prior to medical school he worked as a volunteer firefighter

10  and emergency medical technician (EMT-A). As an emergency physician, he works closely with

11  various fire departments, providing EMS medical direction, which involves writing and teaching

12  EMS protocols and performing quality assurance activities.[1]

13      Dr. Michael Curtis agrees with the conclusions of the expert retained during the criminal

14  investigation, concluding, "Although the forensic pathologist listed the cause of death as 'multiple

15  drug intoxication', the drugs identified in the toxicology report did not contribute equally to her

16  death, and the overdose of morphine was the primary culprit in her death. Based on my education,

17  training and experience, and to a reasonable degree of medical certainly, the large overdose of

18  morphine accounted for more than 99% of the reason why she died."[2]

19      Richard Clark, M.D., FACEP, FACMT is Board Certified in Emergency Medicine, with a

20  Subspeciality in Medical Toxicology. He is a Distinguished Professor of Clinical Emergency

21  Medicine at the University of California – San Diego. In his report dated March 25, 2024, Dr.

22  Clark opines that it was the ingested morphine that caused Tiffany Slatsky's death. Dr. Clark

23  further opines that based on the timeline established during the criminal investigation, that to a

24  reasonable degree of medical probability, Tiffany Slatsky ingested more morphine after she got

25  back from the Firehouse and before she went to sleep and it was this second ingestion of morphine

26  _____

27  [1] **Exhibit P.**

28  [2] *Id.*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  that caused her death.  Dr. Clark's opinion is based on the half-life of Narcan and the amount of

2  time after the administration of Narcan that she was awake and explained fully in his report.[3]

3              1.        **Conclusion of criminal investigation.**

4          As a result of the criminal investigations, Candito was charged with the murder of his wife

5  and theft of Narcan from the City of North Las Vegas.  Thereafter, Candito was indicted by the

6  Grand Jury for Second Degree Murder (a Category A felony) and Burglary (a Category B felony).

7  Specifically, Candito's Indictment charged that Candito:

8              did willfully, unlawfully, feloniously, and with malice aforethought, kill
            TIFFANY SLATSKY, a human being by selling and/or giving and/or trading or
9          otherwise making available MORPHINE to the said TIFFANY SLATSKY who
            then ingested the controlled substance which proximately caused her death.
10

11  and

12             did willfully, unlawfully, and feloniously enter a building, owned or
            occupied by the North Las Vegas Fire Department, located at 2626 East Carey
13          Avenue, North Las Vegas, Clark County, Nevada, with intent to comment larceny.

14  *See Docket, The State of Nevada v. Christopher Neal Candito*, Case No. C-21-357975-1.

15         Candito was eventually convicted and sentenced to incarceration in the Nevada

16  Department of Corrections.  *See Candito's Judgment of Conviction*, attached hereto as **Exhibit E**.

17         C.        **The City of North Las Vegas played no part in Ms. Slatsky's death.**

18         So, the conclusion is inescapable, Candito obtained and distributed illegal narcotics to

19  others, including his wife, Tiffany Slatsky.  Candito took illegal narcotics himself and was aware

20  that Slatsky did as well.  Then, when Slatsky overdosed, Candito, while off-duty, and in

21  contravention of his oath, his code of ethics, his training, and CNLV policy, took Slatsky to

22  Firehouse 51 where he left Slatsky in the car while he snuck into the station and stole Narcan and

23  IV equipment.  Successfully avoiding detection, Candito then drove to a nearby parking lot and

24  administered the Narcan while they were still inside his vehicle.  When the Narcan took effect, he

25  took his wife home instead of a hospital and continued the same behavior that had led to the

---

27  [3] *See Dr. Richard F. Clark's, M.D., Expert Report, Dated March 25, 2024*, attached hereto as
    **Exhibit R**.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    parking lot administration of Narcan in the first place.

2         Plaintiffs Mariah Maas, as Special Administrator for the Estate of Tiffany Slatsky, and

3    Martin Slatsky, as parent and legal guardian of Cade Slatsky, a minor, filed their lawsuit against

4    Christopher Candito, Andrew Clapper, Nicholas Robison, Andrew Stocker, and the City of North

5    Las Vegas on February 7, 2022, alleging nine causes of action, including six against CNLV, (1)

6    Denial of Medical Care; (2) Substantive Due Process; (3) Municipal Liability; (4) violations of the

7    Nevada Constitution; (5) False Imprisonment; and (6) Battery.

8         CNLV filed a motion to dismiss Plaintiffs' Complaint on May 20, 2022. (ECF No. 21).

9    However, with the record not developed, and accepting the Plaintiff's contention paragraphs as

10   true – many of which have either been disproven or shown to lack supportive evidence – the Court

11   denied it, allowing the claims involving Candito to proceed.

12        Now that discovery is closed CNLV renews its argument that it is not responsible for Ms.

13   Slatsky death either directly via Plaintiffs' claim for municipal liability or indirectly via Plaintiffs'

14   claims against Defendant Candito. Plaintiffs cannot show (1) that Tiffany Slatsky's death was the

15   result of some unconstitutional policy, custom, plan or scheme; (2) that Defendant Candito was

16   acting within the course and scope of his duties as a CNLV EMT; or (3) that Defendant Candito

17   was acting under color of state law. In the absence of this evidence, Plaintiffs cannot succeed in

18   establishing that CNLV is directly or vicariously liable for Ms. Slatsky's death. In light of this,

19   CNLV is entitled to summary judgment as to each of Plaintiffs' causes of action and respectfully

20   requests the Court enter an order granting this motion.

21   II.   **SUMMARY JUDGMENT STANDARD**

22        Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

23   proper "where the record before the Court on the motion reveals the absence of any material facts

24   and [where] the moving party is entitled to prevail as a matter of law." *Zoslaw v. MCA*

25   *Distributing Corp.*, 693 F.2d 870, 883 (9th Cir. 1982), cert. denied, 460 U.S. 1085 (1983) (quoting

26   *Portland Retail Druggists Association v. Kaiser Foundation Health Plan*, 662 F.2d 641, 645 (9th

27   Cir. 1981), cert. denied, 460 U.S. 1085 (1983). "A material issue of fact is one that affects the

28   outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    7

1  *Securities and Exchange Commission v. Seaboard Corporation*, 677 F.2d 1289, 1293 (9th Cir.

2  1982); United States v. First National Bank of Circle, 652 F.2d 882, 887 (9th Cir. 1981).

3        The party moving for summary judgment has the burden of showing the absence of a

4  genuine issue of material fact, and the court must view all facts and inferences in the light most

5  favorable to the responding party.  *See Adickes v. S.H. Dress & Co*., 398 U.S. 144, 157, 90 S. Ct.

6  1598, 26 L. Ed. 2d 142 (1970) (footnote omitted).  *See also, Zoslaw, supra*, 693 F.2d at 883;

7  *Lessard v. Applied Risk Management*, 2002 U.S. App Lexis 20810 (9th Cir. October 3, 2002);

8  *Warren v. City of Carlsbad*, 58 F.3d 439 (9th Cir. 1995).  Once this burden has been met, "[t]he

9  opposing party must then present specific facts demonstrating that there is a factual dispute about

10  a material issue." *Zoslaw, supra*, 693 F.2d at 883.  The movant is entitled to summary judgment if

11  the non-moving party, who bears the burden of persuasion, fails to designate "'specific facts

12  showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106

13  S.Ct. 2548, 91 L. Ed. 2d 265 (1986).  Thus, in order to preclude a grant of summary judgment, the

14  non-moving party must set forth "'specific facts showing that there is a genuine issue for trial.'"

15  *Matsushita Elec. Indust. Co., Ltd. V. Zenith Radio Corp*., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106

16  S.Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56 €).

17        As the courts have emphasized over and over again, only genuine issues of material fact

18  will defeat summary judgment.  In *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed.

19  2d 686 (2007), the Supreme Court spoke directly to the respective summary judgment burdens in a

20  civil rights excessive force case where the plaintiff denies any wrongdoing,

21        "[T]he mere existence of some alleged factual dispute between the parties will not
        defeat an otherwise properly supported motion for summary judgment; the
22        requirement is that there be no genuine issue of material fact." [citation omitted]
        When opposing parties tell two different stories, one of which is blatantly
23        contradicted by the record, so that no reasonable jury could believe it, a court
        should not adopt that version of the facts for purposes of ruling on a motion for
24        summary judgment.

25        Given these statements regarding summary judgment and based on the facts and law

26  discussed herein, Plaintiffs cannot prevail on their claims.

27  …

28  …

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

III.     **LEGAL ARGUMENTS**

A.     **The City of North Las Vegas cannot be held vicariously liable both because there is no respondeat superior liability in the civil rights context, but also because Candito failed in his attempt to require the City of North Las Vegas to indemnify him.**

Plaintiff's Federal Constitutional claims are brought pursuant to 42 U.S.C. §1983 which reads in relevant part:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any State or Territory or of the District of Colombia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

A person deprives another "of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). The statute requires that there be an actual connection or link between the actions of the defendant and the deprivation alleged to have been suffered by plaintiff. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Rizzo v. Goode*, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976).

There is no *respondeat superior* liability under 42 U.S.C. § 1983. *Palmer v. Sanderson*, 9 F.3d 1433, 1437-38 (9th Cir. 1993). Thus, to avoid the *respondeat superior* bar, the plaintiff must allege and prove personal acts by the defendants which have a direct causal connection to the constitutional violation at issue. *Sanders v. Kennedy*, 794 F.2d 478, 483 (9th Cir. 1986); *Paine v. City of Lompoc*, 265 F.3d 975, 984 (9th Cir. 2001) (whether or not each defendant "is a participant in the incidents that could give rise to liability" is a necessary element of the § 1983 claim). Section 1983 provides for relief only against those who, through their personal involvement as evidenced by affirmative acts, participation in another's affirmative acts, or failure to perform legally required duties, causes the deprivation of the plaintiff's constitutionally protected rights. *Johnson*, 588 F.2d at 743.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    9

1    CNLV did not personally participate in the alleged violations of Plaintiffs' constitutional

2  rights.  Because there is no *respondeat superior* liability with claims involving allegations of

3  constitutional violations, Plaintiffs attempt to link the alleged constitutional violations to a state

4  actor who personally participated in the underlying incident at issue and for which CNLV might

5  be responsible – in this case, Candito.  However, CNLV is not obligated to indemnify Candito as a

6  matter of law pursuant to Court Order entered in the Eighth Judicial District Court of Nevada,

7  Case No. A-24-894466-C.  The Nevada State District Court held that Candito failed to comply

8  with NRS §§ 41.0339, 41.0349 and was not entitled to statutory defense or indemnification.  *See*

9  *Order Granting Defendant City of North Las Vegas's Motion to Dismiss Plaintiff Christopher*

10  *Candito's Complaint with Prejudice, Eighth Judicial District Court of Nevada, Case No. A-24-*

11  *894466-C.*

12    In light of the application of law to the facts of the case, Plaintiffs' constitutional claims for

13  Denial of Medical Care, Substantive Due Process and violation of the Nevada Constitution fail as

14  a matter of law and CNLV is entitled to summary judgment.

15    **B.    CNLV is not liable for a civil rights violation as a municipality.**

16    A local government may not be sued for a violation of constitutional rights inflicted solely

17  by its employees or agents.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694,

18  98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).   Instead, a municipality may only be liable for an injury

19  caused by a constitutional violation in three possible circumstances.  See *Clouthier v. County of*

20  *Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), overruled on other grounds by *Castro*, 833

21  F.3d 1060.  A local government may be liable if "execution of a government's policy or custom,

22  whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

23  official policy, inflict[ed] the injury." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S.

24  658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  A local government can fail to train employees

25  in a manner that amounts to "deliberate indifference" to a constitutional right, such that "the need

26  for more or different training is so obvious, and the inadequacy so likely to result in the violation

27  of constitutional rights, that the policymakers of the city can reasonably be said to have been

28  deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    10

1   103 L. Ed. 2d 412 (1989); *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006).

2   Third, a local government may be held liable if "the individual who committed the constitutional

3   tort was an official with final policy-making authority or such an official ratified a subordinate's

4   unconstitutional decision or action and the basis for it." *Rodriguez v. Cnty. Of Los Angeles*, 891

5   F.3d 776, 802-803 (9thCir. 2018); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir.

6   2013).

7          In this case, Plaintiffs' municipal liability claim is premised upon CNLV's failure to

8   maintain adequate policies, procedures, or practices with regard to drug use by its employees and

9   the alleged effects thereof, including, Plaintiffs' entirely unsupported and irresponsible claim that

10  Station 51 was a "party station" known for its drug use.  Plaintiffs also claim that CNLV failed to

11  train Candito in emergency medical treatment and the administration of Narcan sufficiently to

12  satisfy their constitutional obligations and that CNLV in some way "ratified" Candito's

13  unconstitutional conduct.

14         There is no evidence to satisfy any of the elements of this cause of action and Plaintiffs

15  cannot support this claim under any of the three theories described above.

16         1.    **CNLV Defendants maintained sufficient policies and procedures**

17               **relevant to Plaintiffs' claims.**

18         To establish municipal liability under *Monell*, Plaintiffs must prove that (1) they were

19  deprived of a constitutional right; (2) the municipality had a policy, practice, custom or scheme;

20  (3) the policy, practice, custom or scheme amounted to deliberate indifference to their

21  constitutional right; and (4) the policy, practice custom or scheme was the moving force behind

22  the constitutional violation.  See *Lockett v. City of Los Angeles*, 977 F.3d 737 (9th Cir. 2020);

23  *Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000) (citing *Monell v.*

24  *Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978). Stated

25  another way, "[m]unicipal liability under Section 1983 attaches where - and only where - a

26  deliberate choice to follow a course of action is made from among various alternatives by the . . .

27  officials responsible for establishing final policy with respect to the subject matter in question."

28  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 89 L. Ed. 2d 452 (1986);

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L. Ed. 2d 114 (1985); *City of Oklahoma*

2  *City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L. Ed. 2d 791 (1985).

3    There must be significant evidence to show that a policy existed specifically authorizing or

4  condoning the alleged practice.  *Davis v. City of Ellensburg*, 869 F.2d 1230 (9th Cir. 1989).  On

5  the quantum of proof necessary for a municipal liability suit, the Supreme Court concluded that

6  "considerably more proof than the single incident will be necessary to establish both the requisite

7  fault on the part of the municipality, and the causal connection between the policy and the

8  constitutional deprivation."  *Tuttle*, supra 471 U.S. at 824; *Nadell v. Las Vegas Metropolitan*

9  *Police Dept.*, 268 F.3d 924 (9th Cir. 2001); *McDade v. West*, 223, F.3d 1135, 1141 (9th Cir.

10  2000)(plaintiff cannot demonstrate the existence of a policy based on a single occurrence of

11  unconstitutional action committed by a non- policy making employee);*Trevino v. Gates* 99 F3d

12  911,918 (9th Cir. 1996)("Liability for improper custom many not be predicated on isolated or

13  sporadic incidents; it must be founded upon practices of sufficient duration, frequency and

14  consistency that the conduct has become a traditional method of carrying out policy").  Such a

15  policy must result from a deliberate choice made by a policy-making official and may be inferred

16  from widespread practices or "evidence of repeated constitutional violations for which the errant

17  municipal officers were not discharged or reprimanded," *Gillette v. Delmore*, 979 F.2d 1342, 1349

18  (9th Cir. 1992); *Nadell v. Las Vegas Metropolitan Police Department*, 268 F.3d 924 (9th Cir

19  2001).

20    CNLV maintained policies and procedures specifically designed to address standards of

21  conduct and drug use by employees of the North Las Vegas Fire Department, including, but not

22  limited to NLVFD Policy 1.0.3 – Substance Abuse/Drug Free Workplace; and NLVFD 1.0.0 –

23  General Rules of Conduct.  Both policies mandate that Fire Department employees maintain a

24  drug free workplace and abide by the law.  *See NLVFD Policy 1.0.0 – General Rules of Conduct*,

25  attached hereto as **Exhibit F**; *see also NLVFD Policy 1.0.3 – Substance Free Workplace*, attached

26  hereto as **Exhibit G**.

27    CNLV retained John Peters as an expert witness in this case.  Dr. Peters is an expert in the

28  area of public safety policies and procedures, training, and administrative investigations.  In his

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1    12

report, Dr. Peters opines on CNLV's policies and procedures as they relate to this case.

- **The City of North Las Vegas (CNLV)and/or the North Las Vegas Fire Department (NLVFD) had written policies in effect that are consistent with municipal and fire agency national standards and recommended guidelines.**

According to Dr. Peters, CNLV had policies and procedures in 2020 that were in accord with the International Association of Fire Chiefs (IAFC) and the United States Fire Administration (USFA).  Among those policies are:

- o   CNLV, "Administrative Policy, 3.06 Standards of Conduct," Revised October 29, 2012.
- o   NLVFD, General Rules of Conduct 1.0.0," Revised December 10, 2017.
- o   NLVFD, "Substance Abuse/Drug Free Workplace 1.0.3," Revised December 12, 2017.
- o   NLVFD, "Peer Support Team Critical Incident Stress Defusing/Debriefing 1.1.10," Revised March 25, 2021.
- o   NLVFD, "Fire Station Security 1.1.22," Revised May 5, 2018.
- o   NLVFD, "EMS Controlled Substances 6.1.1," Revised May 22, 2013.
- o   NLVFD, "EMS Inventories 6.1.2," Revised April 5, 2017.
- o   NLVFD, "EMS Incident Documentation 6.1.3," Revised September 1, 2016.
- o   NLVFD, "Release of Medical Assistance 6.1.4," Revised April 5, 2017.
- o   "Clark County EMS System Emergency Medical Care Protocols," August 5, 2022, replaces January 31, 2022.

Also relevant to Plaintiffs' allegations regarding policy and procedure are Nevada Revised Statutes, which make it illegal to possess, traffic, or distribute drugs or controlled substances, use or possess with intent to use drugs or controlled substances, or sell drugs or controlled substances. EMTs also take an "Oath" to uphold the United States Constitution, the Nevada Constitution, and to not violate the laws.  *See Dr. John G. Peters, Jr., CLS, CTC, Ph.D. Curriculum Vitae*, attached hereto as **Exhibit H**.

City of North Las Vegas Fire Department Chief Jospeh Calhoun, testified regarding

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    CNLV's policies and procedures during his deposition.

2        Q:    In February of 2020, did fire department employees receive a
     physical copy of the substance abuse policy?

3        A:    I don't know if they received a physical copy.  We have a system in
4    the City where updated policies are sent out, require you to review and, you know,
     clicked.  Before the city enacted the program where they had City policies that
5    came out that had to be reviewed, any new SOG or City policy used to go through
     our system for them to review and click that they received it.

6        . . . .

7        Q:    All right.  So under [The City's Substance Abuse Policy], non-CDL
     fire department employees could only be tested for drug or substance use if there
8    was reasonable cause to suspect as much; is that accurate?

9        A:    Correct.  And the other thing, as well, was a vehicle accident, a
     major vehicle accident.

10        . . . .

11        Q:    From 2016 to February 2020, and to the extent you know in 2016,
     what steps did CNLV take to ensure that its emergency medical personnel were not
12    providing medical treatment while under the influence of non-prescribed
     substances?

13
        A:    Well, obviously, number one, we had a policy in place and then we
14    also, as I stated earlier, there was education to be able to watch for personnel that
     might exhibit signs or symptoms of some type of intoxication or drug use to trigger
15    the reasonable suspicion.  And then, obviously, at that point during – through this
     policy, anybody involved in an accident that involved an injury or a vehicle that
16    was significantly damaged, need to be towed away, they were sent for drug screens.

17        . . . .

18        Q:    So [the Substance Abuse Policy] is kind of limited to an employee
     workday.  What was CNLV's fire department policy regarding illegal or
     unprescribed drug use outside of working hours by its employees?

19
        A:    In our general rules of conduct, it does talk about, number one,
20    people are not – shall not violate the law.  And it talks – yeah, and it says that the
     [sic] shall obey the law.  And I believe there was one more specific to drug use on
21    here.  Maybe it was just the – maybe I think what we have just utilized there is
     obeying the law and not bring any disrepute on the fire department.  I know that's
22    not exact language in there, but -yeah.  There's no direct language on that.  But we,
     in some of these cases and other cases, have used – in these specific cases, we use
23    just general violation of the law.

        . . . .

24

25    *See Deposition Transcript of CNLVFD Chief Joseph Calhoun, at p. 15, ll. 6-19; pp. 16-20; pp. 35-*

26    *37; pp.70-80,* attached hereto as **Exhibit I**.

27        In sum, the evidence clearly establishes that CNLV maintains policies and procedures that

28    are consistent with municipal and fire agency national standards and that comport with the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   recommendations of the IACP and the USFA.  There is certainly no evidence that CNLV's

2   policies and procedures actually caused a violation of Plaintiffs' constitutional rights; nor is there

3   any evidence that they specifically authorized or condoned an unconstitutional practice.  This is

4   especially so in light of the requirement that "considerably more proof than the single incident will

5   be necessary to establish both the requisite fault on the part of the municipality, and the causal

6   connection between the policy and the constitutional deprivation."  *City of Oklahoma City v.*

7   *Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 85 L. Ed. 2d 791 (1985).

8                    2.    **Defendant EMTs, including Candito, were appropriately trained by**

9                          **CNLV.**

10          Plaintiffs also claim that CNLV failed to adequately train Candito, and that this failure of

11   training resulted in the death of Tiffany Slatsky.

12          A plaintiff may prove municipal liability under a theory of inadequate training. *Monell v.*

13   *Dep't ofSocial Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  To prove

14   failure to train as a constitutional violation, Plaintiffs must show that (1) they were deprived of a

15   constitutional right, (2) CNLV had a training policy that amounted to deliberate indifference to the

16   constitutional rights of the those with whom they are likely to come into contact, including

17   Plaintiffs; and (3) their constitutional injury would have been avoided had CNLV properly trained

18   its EMTs.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). Deliberate

19   indifference requires proof that a "municipal actor disregarded a known or obvious consequence of

20   his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011).  To

21   prove deliberate indifference, Plaintiffs must prove a pattern of similar constitutional violations by

22   untrained employees or show that the need for more or different training is "so obvious" and the

23   inadequacy is "so likely to result in the violation of constitutional rights," that the training is

24   indifferent.  *Connick v. Thompson*, 563 U.S. 51, 61, 72, 131 S. Ct. 1350, 179 L. Ed. 2d 417

25   (2011); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412

26   (1989).

27          To show the requisite standard of culpability in support of a "failure to train" municipal

28   liability claim, a plaintiff must first demonstrate that the existing training program was inadequate,

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  keeping mind that the adequacy of a particular program must be resolved in relation to the tasks

2  the particular employees must perform.  See *Merritt v. County of Los Angeles*, 875 F.2d 765, 770

3  (9th Cir. 1989).  A training program will be deemed adequate if it "enable[s] officers to respond

4  properly to the usual and recurring situations with which they must deal."  *Merritt*, supra, 875 F.2d

5  at 770.

6         The actions of an officer at the time of the incident alone, are not sufficient basis for

7  imposing liability on CNLV.  The failure to train one officer is insufficient to establish a

8  municipality's deliberate policy.  *Blankenthorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir.

9  2007).  "Adequately trained officers occasionally make mistakes; the fact that they do says little

10  about the training program or the legal basis for holding the county liable."  *City of Canton*, supra,

11  387 U.S. at 391; see also *Merritt*, supra, 875 F.2d at 770.  "In virtually every instance where a

12  person has had his or her constitutional rights violated. . . a Section 1983 plaintiff will be able to

13  point to something the city 'could have done' to prevent the unfortunate incident."  *City of*

14  *Canton*, supra, 387 U.S. at 392.  Nonetheless, speculations of this sort, without meaningful

15  evidence of patent inadequacy, are insufficient to withstand summary judgment.

16         Specifically, in terms of the quantum of proof necessary to establish inadequate training,

17  the Ninth Circuit has determined there is a question of fact in terms of deliberate indifference,

18  failure to train and supervise only when evidence of "program-wide inadequacy" is shown.

19  *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994).  Proof of a

20  program wide inadequacy will require proof of more than a single or sporadic incidents.  *Davis v.*

21  *City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989)("Davis has failed to establish that there is

22  a genuine issue of material fact regarding the existence of a policy of inadequate training. . . A

23  plaintiff cannot prove the existence of a municipal policy or custom based solely on the

24  occurrence of a single incident of unconstitutional action by a non-policy making employee.")

25         In response to Plaintiffs' claim regarding the training of Candito and other EMTS, CNLV

26  produced each of the Defendant EMTs' training records which are voluminous.  Again, Dr. Peters

27  reviewed the EMT training files and opined regarding the training.

28         • **CNLV trained Candito, Clapper, Honsowetz, Robinson, and Stocker consistent**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

with State of Nevada, U. S. Fire Administration , and/or EMS national requirements, guidelines, and recommendations.

- **CNLV used competency-based, job-related training and quantifiable testing of Defendant fire service employees knowledge, skills, competency, and understanding their core tasks, which are consistent with generally accepted training and competency-based testing standards.**

- **The City of North Las Vegas evaluated the work performance of Candito, Clapper, Honsowetz, Robinson, and Stocker on an ongoing basis that is consistent with generally accepted administrative and police practices.**

In addition, each of the EMT Defendants provided relevant testimony concerning the training they received during their depositions:

    Q:    With respect to administering medications for the North Las Vegas Fire Department, did you receive training on that?

    A:    Yes.

    Q:    Okay.  Is there like a specific training course that you go through specifically at the department as opposed to your certifications?

    A:    I think it's mainly the certification.  I don't recall if – if there's some change in protocol or something that's new, they'll review it and go over it, but you're expected to give medication when you're hired.

*See Deposition Transcript of Andrew Stocker, at p. 65, l. 25 – p. 66, ll. 1-11,* attached hereto as **Exhibit J**.

    Q:    And does your position as a firefighter with the fire department require specific training?

    A:    Yes.

    Q:    What kind of training did you have to complete?

    A:    Fire Academy.

    Q:    Did you attend that in Las Vegas?

    A:    Yes.

    Q:    And how long is that training?

    A:    I think it was like 16 weeks.

*See Deposition Transcript of Steven Honsowetz, at p. 23, ll. 14-25*, attached hereto as, **Exhibit K**, .

    Q:    Do you recall if you held any professional licenses or certifications

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1    17

1     in February 2020?

2              A:     Yes.

3              Q:     And what were those?

4              A:     Advanced EMT.

5              Q:     And when did you obtain that certification?

6              A:     I suppose 2007, 2006.

7              Q:     And did you obtain that in the process of seeking employment with the fire department?

8              A:     Yes.

9              Q:     Was it required in order to be employed with the fire department?

10

11             A:     I believe EMT Basic is what they called it at the time.  And then Advanced EMT used to be called EMT Intermediate.  And so I took both EMT Basic and EMT Intermediate around 2006 through CSN.

12

13             Q:     And did you have to do continuing education to keep these certifications up?

14             A:     Yes.

15             Q:     What kind of continuing education?

16             A:     We had a certain number of hours we had to complete every year, and I do not remember how many.  But it was either hands-on training, or online

17     courses that the fire department would provide.

18     *See Deposition Transcript of Andrew Clapper, at p. 25, ll. 13-25 – p. 26, ll. 1-11*, attached hereto

19     as **Exhibit L**.

20             Q:     Did you go to college after that?

21             A:     I went to EMT school.

22             Q:     And where did you do that?

23             A:     I don't know if it's still in existence anymore.  It was EMT Training Center of Southern Nevada.

24             Q:     What period of time were you at the EMT Training Center?

25             A:     2005 to 2006.

26             Q:     And did you complete that program?

27             A:     Yes.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Q:    So when you completed that program, did you leave with specific certifications or licenses?

2

3    A:    I went – well, that specific time I went for EMT basic and then I got more advanced levels of EMT training later on.

. . . .

4

5    Q:    At the time of Tiffany's death, what professional licenses and certifications did you hold?

6    A:    Paramedic certification.

7    **Exhibit C**, at p. 29, ll. 21-25 – p. 31, ll. 1-6.

8    Notably, none of the EMT Defendants were trained or otherwise authorized to perform

9    criminal acts, and indeed, Candito testified that he acted outside of his training when he attempted

10    to treat Slatsky's overdose symptoms on his own with stolen equipment. *Id.*, at p. 132, ll. 7-25 –

11    p. 138, l. 1; p. 196, ll. 12-25 – p. 199, l. 1; p. 228, ll. 12-17.

12    CNLV Deputy Fire Chief, Justin Campbell provided testimony concerning how CNLV

13    Firefighter EMTs are trained, generally, and specifically with regard to Narcan use:

14    Q:    And what is your understanding of what the National Highway of Traffic Safety, what their policies were regarding paramedic training for Narcan or naloxone?

15

16    A:    So they – they are the ones that set the standard for – the EMS education standards for EMTs, medical education standards for EMTs. In there,

17    documented is specifically those principles of pharmacology, medication administration, toxicology where it specifically lists opiates as areas that must be

18    covered. And this is – they also list different levels of how in-depth that education has to be, whether it's for EMT, AEMT, or paramedic. And so in each one of those

19    things – and, in fact, you know, I just yesterday was assigned my recertification classes for my paramedic, and specifically goes through Narcan, the half life,

20    indications, contraindications, talking about the, you know, synergistic effects of other drugs compared to the Narcan use, and then at the end, you have a test that

21    you have to take and go through those and answer those to pass the class. So in – those are very similar. The training is very in-depth. And with Narcan,

22    specifically, even police officer carry it now. It's available in vending machines downtown. So – but we – we go into any pharmacological class that you have on

23    any of the medications, it's an in-depth class where when you're in school to make sure that you understand the inner workings of those medications and then – like I

24    said, that class I took yesterday was for recertification. And so we have recertification classes that we do. So, you know, we had between January 2015 and

25    January of 2020, Defendant Candito completed 109 EMS classes that – guided by the requirements of the Southern Nevada Health District. And any time there's any

26    discussion about unconsciousness, fainting, respiratory depression, altered mental status, anything like that, toxicology, and drug use is – is brought up with – along

27    with those, just like diabetes are also major indicators for those things. So you have to discuss those – those complications and also the treatments when you're

28    talking about those. So the – when it comes to training specifically, Defendant

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Candito, he obviously became an EMT in 2010 and upgraded to a paramedic in
     2017. Or he attended the NCTI paramedic program. Those programs were
2    anywhere from 1,200 to 1,800 hours of training. They used the National EMS
     Education Standards for both their AEMT and EMT paramedic to cover in-depth
3    those topics: Pharmacology, airway, respiratory, emergencies, toxicology, opiate
     overdoses. And then he recertified his AEMT, completing 38 hours of continuing
4    education in both 2012 and '14. And, like I said, 109 guided classses from
     Southern Nevada Health District.
5
          . . . .
6         Q:       During the time that Defendant Candito was employed with
     Defendant CNLV, would he have received training regarding what to do if he
7    administered Narcan to a patient, and patient then refused to go to the hospital?

8         A:       Yes.

9         Q:       And what would that training include?

10        A:       It would include ensuring that there was documentation – as to that
     person signing a release of medical assistance, saying that they did not want to go
11   against our advice. So we – anytime there would be – and that doesn't just
     surround a narcotic overdose and use of Narcan. That could be anything, a diabetic
12   when you give them sugar, or anything along those lines you have to tell them, you
     know, Hey, look, this is a temporary fix. You should go get checked out. And we
13   will take you down there. So if they refuse, unless they are a threat to themselves
     or others, then – if they are alert and oriented, can answer, you know, questions that
14   put them to where they know the date and time, place, situation, things of those
     nature, then they would be allowed to sign an AMA, because we can't force them to
15   go if they refuse. We did see that Candito had multiple narcotic overdoses where
     he did give Narcan, and every single one of those patients was transported to the
16   hospital, though.

17   *See Deposition Transcript of CNLV Deputy Chief Justin Campbell, at pp.18-19; pp. 22-24; pp. 26-*

18   *32; pp. 38-41; pp. 49-50,* attached hereto as **Exhibit M**.

19       Simply put, there is no evidence of program wide training deficiency, no evidence of

20   deliberate indifference and no evidence that any training or lack thereof caused Tiffany Slatsky's

21   death. Indeed, the evidence demonstrates the opposite is true: EMTs working for CNLV were

22   trained and re-trained more than adequately for them to respond to the usual and recurring

23   situations that they faced. The actions of Chritopher Candito during this incident are not, alone

24   sufficient to provide a basis for municipal liability.

25            3.       **CNLV did not ratify unconstitutional conduct.**

26       A local government may be held liable if "the individual who committed the constitutional

27   tort was an official with final policy-making authority or such an official ratified a subordinate's

28   unconstitutional decision or action and the basis for it." *Rodriguez v. Cnty. Of Los Angeles*, 891

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    20

1  F.3d 776, 802-803 (9thCir. 2018); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir.

2  2013). There is no evidence that any CNLV official with final policy making authority was

3  involved in Tiffany Slatsky's death in any way and there is no evidence that such an official

4  ratified any unconstitutional conduct.

5        Included in their complaint and maintained ever since is Plaintiffs' unfounded allegation

6  that Firehouse 51 was a "party house", that CNLV knew it was such, and that after Tiffany

7  Slatsky's death, CNLV did not act to discipline those involved. Plaintiffs allege or suggest that

8  Firehouse 51 was a station known for its parties at which drinking alcohol, taking illegal drugs,

9  and improperly fraternizing with members of the opposite sex was tolerated. There is no evidence

10  to support these claims. In fact, the evidence in the case supports the opposite, including the

11  testimony of Candito and the other EMT Defendants:

12        Q:    Other than your mom, did you have any other females visit the fire
station?

13

14        A:    No.

15        Q:    Do you know if anyone at Station 51 ever had any of their spouses
or women visit the station while you worked there?

16        A:    It's possible.

17        Q:    Do you recall any specific instances where there was women at the
Station 51?

18

19        A:    I remember Lisa Sutton coming through. She's an active member
with The Burn Foundation. I believe she did some kind of advertisement of
something while she was there, or an interview, or – it was work-related though.

20        . . . .

21        Q:    I know you mentioned you sometimes host dinners. Did you ever
have parties at the fire station?

22

23        A:    No.

      Q:    Did you ever hear discussions of any parties going on at Station 51?

24        A:    No.

25        Q:    Did you ever hear of any strippers dancing on the fire poles at

26  Station 51? [another of Plaintiffs' allegations]

27        A:    No.
      Q:    Did you ever witness strippers dancing on a fire pole at Station 51?

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                                                 21

1       A:    No.

2       Q:    Did you ever witness anyone drinking alcohol at Station 51?

3       A:    No.

4       Q:    Are you allowed to drink alcohol at the station?

5       A:    No.

6       Q:    Did you ever hear any discussions of people drinking alcohol at

7 Station 51?

8       A:    No.

9       Q:    Did you ever see people doing drugs at Station 51?

10      A:    No.

11      Q:    Did you ever hear discussions of people doing drugs at Station 51?

12      A:    No.

13 **Exhibit J**, at p. 85, ll. 10-25 – p. 87, ll. 1-6.

14      Q:    Do you have any knowledge of firefighters passing the time by having sex workers come to the firehouse? [another of Plaintiffs' allegations]

15      A:    No.

16      Q:    Did you ever have any interactions with girls there in general?

17      A:    No.

18      Q:    Did you ever hear discussions about sex workers being present at the

19 fire station?

20      A:    No.

21 **Exhibit K**, at p. 31, ll. 10-22.

22      Q:    Did you ever hear discussions about Mr. Hansen bring strippers to the fire station? [another of Plaintiffs' allegations]

23      A:    No.

24      Q:    Did you ever hear discussions about Mr. Hansen bringing girls to

25 the fire station generally?

26      A:    No.

27 **Exhibit L**, at p. 42, ll. 14-20.

28      Q:    . . . . So during your time as a captain at Station 51, was there any

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    point where you did observe illegal behavior by a firefighter off duty?

2    A:    No.
. . . .

3    Q:    . . . . Is Station 51 referred to as the black sheep station?

4    A:    Yes.

5    Q:    Do you have any knowledge as to why that is?

6    A:    Yes.

7    Q:    And what is that?

8    A:    I mean, it's a guess . . . . [I]t's based on the fact that we do all the
9    work and get treated, like, differently because we're the ones that are always busy
doing all the work.

10

11   *See Deposition Transcript of Nicolas Robison*, at p. 56, ll. 12-15; p. 90, ll. 21-25 – p. 91, ll. 1-11,

12   attached hereto as **Exhibit N**, .

13   To the extent Plaintiffs contend that CNLV ratified the actions Candito or any of the

14   Defendant EMTs, again, there is no evidence.  In fact, Defendant Candito never worked another

15   day for CNLV after Tiffany Slatsky's death.  He was the subject of administrative and criminal

16   investigations and he was terminated, charged, prosecuted and convicted regarding his actions

17   between February 21 and 23, 2020.  **Exhibit E**.

18   Chief Calhoun detailed CNLV's investigation into the party and Ms. Slatsky's death

19   during his deposition:

20   Q:    So sometime after Tiffany Slatsky's death, CNLV began its own
investigative process; is that accurate?

21

22   A:    Absolutely.

23   Q:    And when did that investigation begin?

24   A:    The morning of her death.  I was notified by one of my battalion
chiefs who had been called by Henderson Police Department to notify me that it
happened.  I remember it very vividly and where I was at and where it happened.
25   And it started from that very second.

26   Q:    And talk me through the steps that CNLV took in this investigation.

27   . . . .

28   A:    I made phone calls just to those different directors, just so that they

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

were aware that this was happening this was obviously something a little bit out of the ordinary.  And especially at that time, the information that we received was, you know, that she had died and that he had broken into the station the night before and gotten the medication.  So that kind of triggered, you know, that whole response.

Q:      And then it states, Investigation started immediately.  And NLVPD contacted for burglary report.

A:      Yes.  I believe that was on Monday morning.  If not Sunday afternoon.  That, I honestly can't say for sure.

. . . .

Q:      The next bullet says, Candito placed on immediate administrative leave.  Breaking into station and stealing medications?

A:      Yeah.  For – for those grounds, based on doing those things.

. . . .

Q:      The next bullet reads, April 20th, 2020, Candito Investigative interview. . . .

A:      Yeah.  We were trying to gather information.  We were, obviously, at that point reliant on, you know, there was a criminal investigation going on.  And so we had been, you know, advised many times, many times by our, you know, legal department that we have to be very careful to not countermand a criminal investigation that was ongoing regarding her death.  In any previous situation that's involved, anything criminal, because we're a public safety organization, we have access, when allowed, to any results of investigations.  And so we knew a criminal investigation was going on, and we would have access to that stuff as they were able to release it to us.  So yes, an investigation was going on.  Chris was placed on paid leave for this.  We were going to, because of what we had learned from talking to Henderson PD, that there was drug use at the house, we were going to send him for a drug test.  And then at that point before we could issue him a drug test, he left the state and went to this treatment program.  And as soon as he came back, that's when we started our process to start the formal investigation with him.

Q:      What steps, if any, had been taken prior to Candito's investigative interview to start the formal investigation process, as you referred to it?

A:      At that point, it was mainly speaking with the law enforcement investigators because they were on the ground actually getting detailed information.  They were – they had access to a lot more information than we would have.  So we were just at their mercy to get what we got as they were able to provide it to us.

**Exhibit I**, at pp. 42-49.

Chief Calhoun goes on to provide additional detail into every aspect of the in-depth investigation and results thereof during his deposition.  In sum, regardless of the municipal liability theory Plaintiffs pursue, they cannot successfully maintain their claim.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    In light of the application of law to the facts of the case, Plaintiffs claim for Municipal

2  Liability fails as a matter of law and CNLV is entitled to summary judgment.

3    C.    **CNLV is not liable for the conduct of Christopher Candito because he was not**

4        **acting within the course and scope of his employment at any time relevant to**

5        **Plaintiffs' causes of action and CNLV is not vicariously liable for his behavior.**

6    In general, an employer will be vicariously liable based on the doctrine of respondeat

7  superior if its employee's acts were committed within the course and scope of his or her

8  employment. *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775 (9th Cir. 2002)

9  (citing Restatement (Second) Agency § 219 (1958)). The Ninth Circuit has established a three-

10  part test to determine whether an act was committed within the course and scope of a person's

11  employment:

12        An employee's conduct is within the scope of employment if and only if: a)
        it is the kind he is employed to perform; b) it occurs substantially within authorized
13        time and space limits; and c) it is motivated, at least in part, by a purpose to serve
        the employer.
14

15  *Madrid v. County of Apache*, 289 Fed. Appx. 155, 157 (9th Cir. 2008) (quoting *Arizona v.*

16  *Schallock*, 189 Ariz. 250, 941 P.3d 1275, 1281 (Ariz. 1997)).

17    Plaintiffs cannot meet any of these elements. Candito was not on duty at any time between

18  February 21 – 23, 2020. He did not clock in; he did not clock out; and he did not apply for any

19  form of compensation, regular or overtime. **Exhibit C**, at p. 132, ll. 7-25 – p. 138, l. 1; p. 196, ll.

20  12-25 – p. 199, l. 1. Instead, he was off duty attending a private party being held at the Golden

21  Nugget Hotel and Casino to celebrate his friend's birthday. He and his wife left the party in the

22  early morning hours of February 22, 2020, and returned to their apartment, where they continued

23  to drink alcohol and consume illegal drugs. At some point during the day, Slatsky took

24  unprescribed and illegally obtained morphine and shortly thereafter Candito noticed that she

25  appeared to be suffering the effects of a drug induced overdose. Instead of calling 911 or taking

26  her to a hospital, Candito put her in his private vehicle and drove her to the firehouse where he

27  was currently assigned. Once there, he snuck in and stole Narcan and IV equipment. Candito then

28  left the fire station parking lot and travelled to a nearby parking area to administer the Narcan.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    25

1   Thereafter, the two returned to their apartment where they continued to drink and take more drugs.

2   Tiffany Slatsky did not wake up the next morning.

3       Second, Candito was not performing actions similar to the kind he performed as a

4   CNLVFD EMT.  Candito was not hired to do anything like any of the actions he took from

5   February 21 – 23, 2020.  Candito was not trained to prescribe or provide morphine (indeed he had

6   no such prescribing authority); treat overdose victims while off duty; place overdose victims in his

7   private vehicle; transport overdose victims to a firehouse (passing any number of hospitals and

8   emergency medical treatment facilities on the way); break into the firehouse and steal Narcan; and

9   administer it in a dark parking lot.

10       Candito testified that as an EMT, when interacting with individuals suspected of

11   overdosing while off duty, he was trained to call 911 and let those who were on duty handle the

12   situation.  He was not hired or trained to take his overdosing wife to a firehouse and have her sit in

13   the car while he snuck inside to steal Narcan.  He was not hired or trained to then drive to a dark

14   parking lot so he could administer the stolen Narcan outside the observation of others.  He was not

15   hired or trained to then take his wife back home and engage in more dangerous behavior, drinking

16   and taking drugs.  And he was not hired or trained to go to sleep and not monitor her well-being

17   through the night.  In fact, Candito testified that he acted in direct contravention to his training and

18   experience as a City of North Las Vegas Fire Department EMT and his explanation for his

19   behavior did not include any motivation to serve his employer, the City of North Las Vegas:

20       Q:    How are you trained as a paramedic to deal with someone who
        needs medical attention when you are not on duty?

21

22       A:    To call 911.

23       Q:    Right.  You're trained to be what they call a good citizen, right?
        Call 911, right?

24       A:    Correct.

25       Q:    And that would be especially so if you were impaired, right?

26       A:    What do you mean?  I'm sorry, I don't understand what you're
        asking.

27

28       Q:    You definitely wouldn't want to do anything if you were impaired at
        the time that you come upon someone that needs medical attention?

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                      26

1             A:     Correct.

2             . . . .

3             Q:     And at the time you believe she was having an overdose – how many cell phones were in your apartment?

4

5             A:     Mine, hers, and Kayla's

Q:     And you didn't use any of those three cell phones to call 911, correct?

6

7             A:     Correct.

8             Q:     You load her into the car, correct?

9             A:     Correct.

10            Q:     Did you drive by the hospital to get to the fire station?

11            A:     Absolutely, yes.

12            Q:     So you could have turned into the emergency room, correct?

13            A:     Could have, yes.

14            Q:     But you didn't?

15            A:     Correct.

16            Q:     You could have called 911 at any time on the way to the firehouse or on the way back, but you didn't?

17

18            A:     Correct.

19  **Exhibit C**, at p. 198, ll. 12-25 – p. 199, l. 1; p. 261, ll. 11-25 – p. 262, ll. 1-9.

20       Not only did Candito admit that he was not acting within the course and scope of his

21  duties, both Defendant experts provided corroborating opinions.

22       Defense Expert John Peters provided opinions to support the obvious that Candito was not

23  acting within the course and scope of his duties, and by extension, as a state actor at any time

24  relevant to this matter.  Mr. Peters laid out several points to support his opinion:

25       &bull;     The City of North Las Vegas had not employed Candito, Clapper, Robison or

26            others to engage in criminal behavior;

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1          27

1    •    The City of North Las Vegas and the North Las Vegas Fire Department had in

2        place formal policies, including their "Standards of Conduct" in order to limit

3        employee discretion and guide employee behavior;

4    •    Candito and other City employees engaged in criminal behavior when they

5        purchased, possessed, transported and/or used controlled illegal substances in the

6        workplace;

7    •    Candito and the other city employees present at the Golden Nugget party were off-

8        duty and not working;

9    •    The Golden Nugget party was not sponsored or otherwise authorized by the City of

10       North Las Vegas;

11    •    The aforementioned criminal behavior did not further the interests of the City of

12       North Las Vegas and/or its fire and/or EMS service objectives;

13    •    Candito violated his oath of office when he used his personal key card to enter the

14       Fire Station 51 because he committed larceny and burglary when he took Narcan

15       and IV equipment to treat Slatsky's overdose symptoms; and

16    •    Neither larceny nor burglary are associated with Candito's job duties;

17   *See John Peters' Expert Report, dated March 21, 2024*, attached hereto as **Exhibit O**.

18       Defense Expert Dr. Michael Curtis provided further support for the proposition that

19   Candito was not acting within the course and scope of his employment when he opined:

20       Finally, based on my education, training and experience, and to a
         reasonable degree of medical certainty, I believe that Christopher Candito was
21       practicing medicine without a license and practicing outside the bounds of his
         scope of practice as a paramedic when he recommended and supplied KADIAN to
22       Tiffany for her pain complaint and when he initiated an IV on her and administered
         Narcan, because his license to practice medicine as a paramedic does not give him
23       independent authority to practice paramedicine outside of the conditions of his
         employment. In Nevada, a paramedic is first certified after completing rigorous
24       education, training and testing. Then he/she is licensed by a state or regional
         authority to work for a licensed ambulance service. His/her authority to assess
25       patients and administer treatments, including parenteral medications, is contingent
         on the authority of the physician medical director for the ambulance service to
26       endorse the paramedic to perform within the assessment and treatment guidelines
         established for that purpose (sometimes called "protocols") or in response to a
27       verbal order by a direct medical control Telemetry Physician or Nurse
         Intermediary. Then, the paramedic's authority to act on behalf of a sick or injured
28       person begins when there is a call for emergency services (e.g., a 911 call) to which

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                28

1   his/her ambulance service and he/she now have a duty to respond. Beyond this
2   narrow set of circumstances, Good Samaritan and exigent circumstances aside, a
    paramedic is not legally allowed to function as a paramedic. The Southern Nevada
3   Health District's regulations (500.026) specifically prohibits independent practice.
    In the case of Candito and Slatsky, Candito was not responding to a call for
4   emergency services on behalf of his employer or operating under the authority of
    medical control when he initiated an IV and administered Narcan to Slatsky.
5   Moreover, KADIAN 60 mg capsule are not in the formulary of the Clark County
    EMS Protocols.

6   *See Dr. Michael Curtis's Expert Report, Dated March 27, 2024,* attached hereto as **Exhibit P**.

7       Indeed, even Plaintiffs' expert, Robin McKinley, provided opinions supporting the

8   conclusion that Candito was acting outside the course and scope of his employment and in a way

9   not foreseeable to his employer.  According to her report, Ms. McKinley is a well-respected,

10  highly complimented Firefighter/Paramedic, EMS Lieutenant, who currently works for The City

11  of Memphis Fire Department in Tennessee.  Per her statements, her report serves, "to determine if

12  Mr. Candito, Mr. Stocker, Mr. Robison and Mr. Clapper adhered to the North Las Vegas Fire

13  Department protocols, standard operating procedures and mission statement, and to determine if,

14  as a City of North Las Vegas Fire Department  paramedic, they performed within his scope of

15  practice, followed his state or local protocols, as well as if he met the standard of care that other

16  reasonable and prudent paramedics would have under similar circumstances."  *See Robin*

17  *McKinley's Expert Report,* attached hereto as **Exhibit Q**.

18      Ms. McKinley concluded that "Mr. Candito not only violated the EMS Code of Ethics, but

19  abandoned Ms. Slatsky in her time of need, abused his position as a CNLVFD employee and

20  licensed paramedic and denied Ms. Slatsky crucial follow-up care for her overdose signs and

21  symptoms. Mr. Candito failed to be an advocate for Ms. Slatsky (his patient) and his actions were

22  grossly negligent and a violation of his local protocols and the National Standards for Paramedics.

23  This gross deviation directly contributed to Ms. Slatsky's demise." *Id*.

24      Ms. McKinley also concluded that Candito directly violated several City of North Las

25  Vegas Fire Department Policies as follows:

26      • North Las Vegas Fire Department General Rules of Conduct 1.0.0:  This policy

27          states that members shall not …"engage in any activity that is detrimental to the

28          department…" or "steal."

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1

1      •     North Las Vegas Fire Department Substance Abuse/Drug Free Workplace 1.0.3:

2            This policy states that its members "…are generally held to a higher standard

3            by the public…," therefore, the NLVFD must "…insist on and provide for a drug

4            free workplace."

5      •     Administrative Policy 3.06 Standards of Conduct:  This policy states that it is the

6            policy of the City to "…promote the well-being of its employees by maintaining

7            high standards of work performance and professional conduct…"  and that

8            employees are expected to "…conduct themselves in a manner deserving of public

9            trust.

10  *Id.*

11  In addition, Ms. McKinley opined:

12      •     Christopher Candito not only violated his Firefighter Oath, but also, did not live up

13            to the North Las Vegas Fire Department's mission statement. Additionally, Mr.

14            Candito, along with Mr. Clapper, Mr. Robison, and Mr. Stocker, violated their fire

15            department's policies by engaging in conduct unbecoming of a public servant, by

16            participating in, or condoning the purchase, distribution and consumption of illegal

17            drugs.

18      •     Christopher Candito abused his position as a CNLVFD employee, using his

19            department issued ID to access Station 51 on the evening of February 22, 2020, and

20            obtain the drug Narcan and other medical supplies. Mr. Candito used the procured

21            Narcan and supplies to treat Ms. Slatsky's overdose signs and symptoms in

22            accordance with the CNLVFD EMS protocols.  He also failed in his duties as a

23            licensed paramedic by acting alone in the treatment of Tiffany Slatsky.  Mr.

24            Candito performed intravenous procedures and administered Narcan to Ms.

25            Slatsky, all on his own and did not seek medical attention for Ms. Slatsky, who was

26            in extremis, and in a vulnerable state. As a result, Ms. Slatsky was found

27            unresponsive, pulseless and apneic on the morning of February 23, 2020.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    • Christopher Candito failed in his duties as an employee of the CNLVFD and a
2    licensed paramedic and was negligent by failing to provide the proper intervention
3    for Tiffany Slatsky on February 22, 2020. Upon discovering her in her altered
4    state, it was Mr. Candito's duty as a city firefighter and trained, certified paramedic
5    to call 9-1-1 for Ms. Slatsky or take her to the closest medical facility for help.
6    Instead, he drove twenty-three miles to his assigned fire station, made entry into the
7    fire station, and obtained medical supplies and medications. Afterwards, he
8    performed medical procedures on Ms. Slatsky, per CNLVFD protocols and
9    administered the drug Narcan to Ms. Slatsky, without the proper follow-up care
10   from a physician. He then drove twenty-three miles back to the Candito residence
11   and put Ms. Slatsky to bed, where she expired.

12   *Id.*

13   Without evidence to demonstrate that Candito was acting within the course and scope of
14   his employment as a CNLV EMT, CNLV cannot be held vicariously liable for his conduct.

15   In light of the application of law to the facts of the case, Plaintiffs' claims for false
16   imprisonment and battery fail as a matter of law and CNLV is entitled to summary judgment.

17   D.   **Candito was not acting under color of state law at any time relevant to**
18        **Plaintiff's causes of action.**

19   "To state a claim under §1983, a plaintiff must allege the violation of a right secured by the
20   Constitution and laws of the United States and must show that the alleged deprivation was
21   committed by a person acting under color of state law." *Moore v. Villanueva*, 2019 U.S. Dist.
22   LEXIS 230719, at *15 (C.D. Cal. 2019) (quoting *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250,
23   101 L. Ed. 2d 40 (1988)). Action under color of state law is "a jurisdictional requisite for a §1983
24   action." *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001) (citation omitted). There is no
25   "rigid formula" for determining whether a state or local official acted under color of state law,
26   *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) (citation omitted); the inquiry "turns on
27   the nature and circumstances of the state actor's conduct and the relationship of that conduct to the
28   performance of his official duties." *Id.*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                      31

1    As an example, a law enforcement officer acts under color of law when his/her actions "are
2    'in some way 'related to the performance of his official duties.'" *Huffman v. Cnty. of L.A.,* 147
3    F.3d 1054, 1058 (9th Cir. 1998) (holding that off-duty sheriff was not acting under color of law
4    when he shot a bar patron with department-issued gun and ammunition); *see Anderson*, 451 F.3d
5    at 1068-69 (holding that police officer acted under color of state law when he invoked law
6    enforcement status to keep bystanders from interfering with his assault on the plaintiff); *see Van
7    Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996) (holding that off-duty officer was not
8    acting under color of law when he burglarized a location he had investigated while on duty); *see
9    Hechavarria v. City & Cnty. of S.F.,* 463 Fed. Appx. 631, 633 (9th Cir. 2011) (holding that off-
10   duty parking control officer did not act under color of law when he assaulted the plaintiff when the
11   officer wore street clothes, drove his personal car, did not represent himself as a city employee,
12   and did not use city resources to initiate or carry out the assault).

13   Plaintiffs claim that Candito was acting under color of law when he provided drugs to
14   Tiffany Slatsky and treated her for her overdose. However, the only basis for the claim is that
15   Candito was a state employed EMT and had *slightly* easier access to Narcan. Plaintiffs' position
16   ignores the factual record developed during discovery, the City of North Las Vegas internal
17   investigation, the Clark County Coroner's administrative investigation, the City of Henderson's
18   criminal investigation and the Drug Enforcement Agency's criminal investigation, all of which
19   determined that Candito unlawfully gained entry to Station 51, not to perform any of his EMT
20   duties, but rather to steal Narcan for his own use in his attempt to treat his wife's overdose
21   symptoms in their failed attempt to avoid potential legal and practical consequence. Plaintiffs'
22   position ignores expert opinion that Candito was acting outside the course of scope of his
23   employment, outside of his training and in violation of his oath. It also ignores Candito's own
24   testimony that he was acting outside of his training and in violation of CNLV policy.

25   Candito was obviously acting in furtherance of his own private agenda and not subject to
26   the control of his CNLV as his employer. He was acting as a private citizen and pursuing a private
27   agenda; acting as a husband to his wife, attempting to avoid potential criminal charges in relation
28   to their consumption of illegal drugs. Because private citizens do not have a constitutional right to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  be protected from the acts of other private citizens, Plaintiffs' constitutional rights were not

2  violated by Candito.

3      In light of the application of law to the facts of the case, Plaintiffs constitutional claims for

4  Municipal Liability, Denial of Medical Care, Substantive Due Process, and violation of the

5  Nevada Constitutional fail as a matter of law and CNLV is entitled to summary judgment.

6  IV.    **CONCLUSION**

7      While an undisputable tragedy, the City of North Las Vegas is in no way responsible for

8  Tiffany Slatsky's death.

9      Throughout this case, Plaintiffs have made unsupported and unsupportable allegations

10 about CNLV and its Fire Department, calling into question the professionalism of the first

11 responders who work there.  They have accused CNLV of tolerating a Firehouse where parties

12 were common, where alcoholic beverages and illegal drugs were distributed and consumed, and

13 even where "sex workers" and "strippers" were invited guests.  (ECF No. 86, ¶¶ 25-35, 82, 83).

14 They included these spurious allegations in publicly filed documents which could only cause the

15 citizens of the City of North Las Vegas to doubt those people they depend upon to be lifesavers.

16     In this motion, CNLV demonstrates that Plaintiffs' causes of action have no merit.

17 Plaintiffs accuse CNLV of having unconstitutional policies/procedures, inadequate training, and a

18 deliberate indifference to the consequences of the actions of its employees.  As shown herein,

19 CNLV's policies are consistent with national standards and recommendations; its training program

20 is specifically designed to prepare its first responders to successfully confront the type of

21 emergencies commonly faced; and its response to the events of February 20-23, 2020, was swift

22 and definitive.

23     Beyond this, there is no evidence that any CNLV policy or training actually caused Tiffany

24 Slatsky's death.  Tiffany Slatsky died as a result of illegal and unprescribed drugs she took at a

25 private party and in the privacy of her own home.  Likewise, her treatment decision was her own.

26 CNLV was not apprised of her precarious position and had no opportunity to intervene.  The fact

27 that her husband was a CNLV EMT was only a happenstance.  Christopher Candito was off duty,

28 impaired, and pursuing a purely private agenda.  He did not notify anyone at CNLV about the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    33

1  situation or call anyone for help.  Candito and Tiffany Slatsky were together more interested and

2  invested in avoiding oversight for their procurement and use of illegal drugs than they were in

3  seeking professional medical care.  The evidence in the case suggests that Christopher Candito

4  wanted to avoid the professional consequences of providing illegal drugs to his wife and Tiffany

5  Slatsky wanted to avoid the practical consequences that a night in the hospital for a drug overdose

6  might have on her pending DUI or the circumstance of her minor son's custody.  Please recall that

7  her son was present in the home with his mother, Candito, and Szabo as they "hung out", drank

8  alcohol and took illegal drugs all that day.  He was present in the home when Candito took her to

9  the Firehouse and surreptitiously entered it to steal Narcan.  He was present in the home when his

10  mother came back from the Firehouse and was feeling well enough to do it all over again.

11        There is no evidence that CNLV is in any way responsible for the behavior of Christopher

12  Candito.  The law regarding the violation of constitutional rights does not allow for the imposition

13  of liability on the misbehaving actor's employer; there is no respondeat superior in the law of civil

14  rights.  Similarly, CNLV is not liable for Candito's tortious behavior through the legal doctrine of

15  vicarious liability because Candito was far outside of the course and scope of his employment.  By

16  his own admission he was off duty and performing acts that violated his training and conflicted

17  with his history of providing medical treatment.  Plaintiffs' own expert witness acknowledged that

18  Candito violated the policies and procedures of CNLV, acted outside of the training he received

19  both at EMT school and that provided by CNLV, and violated the very oath he took upon entry

20  into his profession.  Also, there is no evidence that anything he did that weekend was consistent

21  with the duties of his employment nor did any of his actions inure to the benefit of CNLV as his

22  employer.

23        Lastly, none of Christopher Candito's behavior can be fairly described as state action or

24  action under color of law.  Nothing Candito did qualifies as an exercise of his power possessed by

25  virtue of state law and he was not acting in any official capacity.  As shown throughout, Candito's

26  actions were not related to his public duties.  The real basis for Plaintiffs' complaint is simply that

27  Candito had a governmental employment position and this is not enough to satisfy their burden as

28  a matter of law.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1                                    34

1    The deep pockets of CNLV are not a sufficient basis upon which to impose liability in this

2    case. Beyond the irresistible force of the law, is the unmovable object of logic. If CNLV is liable

3    to Plaintiffs simply because it employed an EMT/paramedic who while off duty and scared for his

4    future or his liberty went off the rails and caused or contributed to his wife's death by decisions

5    that were so outside of his job description that they resulted in felony charges and a criminal

6    conviction, there would be no end to liability and the test to determine course and scope would be

7    rendered moot.

8    Pursuant to the foregoing facts, precedent and legal arguments, the City of North Las

9    Vegas respectfully requests that this Court grant its motion for summary judgment and enter

10   judgment in its favor.

11   V.    **EXHIBIT(S)**

12   A.    Deposition Transcript of Detective Nathan Calvano

13   B.    Declaration of Warrant/Summons

14   C.    Deposition Transcript of Christopher Candito

15   D.    Clark County Coroner Report

16   E.    Candito's Judgment of Conviction

17   F.    NLVFD Policy 1.0.0 – General Rules of Conduct

18   G.    NLVFD Policy 1.0.3 – Substance Free Workplace

19   H.    Dr. John G. Peters, Jr., CLS, CTC, Ph.D. Curriculum Vitae

20   I.    Deposition Transcript of CNLVFD Chief Joseph Calhoun

21   J.    Deposition Transcript of Andrew Stocker

22   K.    Deposition Transcript of Steven Honsowetz

23   L.    Deposition Transcript of Andrew Clapper

24   M.    Deposition Transcript of CNLV Deputy Chief Justin Campbell

25   N.    Deposition Transcript of Nicolas Robison

26   O.    John Peters' Expert Report, dated March 21, 2024

27   P.    Dr. Michael Curtis's Expert Report, Dated March 27, 2024

28   Q.    Robin McKinley's Expert Report

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

159339469.1

35

1    R.    Dr. Richard F. Clark's, M.D., Expert Report, Dated March 25, 2024

2    DATED this 27th day of June, 2025.

3    LEWIS BRISBOIS BISGAARD & SMITH LLP

4    /s/ Robert W. Freeman

5    ROBERT W. FREEMAN
     Nevada Bar No. 3062
6    E. MATTHEW FREEMAN
     Nevada Bar No. 14198
7    6385 S. Rainbow Blvd, Suite 600
     Las Vegas, Nevada 89118
8    *Attorney for Defendants*
9    *City of North Las Vegas*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

159339469.1                                          36

1  **CERTIFICATE OF SERVICE**

2      I HEREBY CERTIFY that on the 27th day of June, 2025, I electronically filed the

3  **CITY OF NORTH LAS VEGAS' MOTION FOR SUMMARY JUDGEMENT** with the Clerk

4  of the Court through Case Management/Electronic Filing System.

5  ANDRE M. LAGOMARSINO, ESQ. (#6711)    LLOYD W. BAKER, ESQ.
   Nevada Bar No. 6711                  Nevada Bar No.: 6893

6  aml@lagomarsinolaw.com             lloyd@bakerattorneys.net
   CORY M. FORD, ESQ. (#15042)        ANDREW BARTON, ESQ.

7  Nevada Bar No. 15042                 Nevada Bar No.: 12692
   cory@lagomarsinolaw.com           drew@855bakerlaw.com

8  LAGOMARSINO LAW               BAKER LAW OFFICES
   3005 West Horizon Ridge Parkway, Suite 241   500 S. Eighth Street

9  Henderson, Nevada 89052            Las Vegas, NV 89101
   Telephone: (702) 383-2864           Telephone: (702) 360-4949

10  Facsimile: (702) 383-0065             Facsimile: (702) 360-3234
   Sydney@lagomarsinolaw.com         Diana@855BakerLaw.com

11  denise@lagomarsinolaw.com          *Attorneys for Plaintiffs*
   Taylor@lagomarsinolaw.com

12  fileclerk@lagomarsinolaw.com
   *Attorneys for Plaintiffs*

13

14  CHRISTIAN M. MORRIS, ESQ.
   Nevada Bar No.: 11218

15  NETTLES MORRIS
   1389 Galleria Drive, Suite 200

16  Henderson, Nevada 89014
   Telephone: (702) 434-8282

17  christian@nettlesmorris.com
   *Attorneys for Plaintiffs*
   DANIEL MARKS, ESQ.              RAYMOND R. GATES, ESQ.

18  Nevada Bar No. 2003               Nevada Bar No. 5320

19  office@danielmarks.net            rgates@ltglaw.net
   ADAM LEVINE, ESQ.             LAURIA TOKUNAGA GATES & LINN, LLP

20  Nevada Bar No. 4673               1755 Creekside Oaks Drive, Suite 240
   adam.levine@danielmarks.net        Sacramento, California 95833

21  LAW OFFICE OF DANIEL MARKS     Phone: 916.492.2000
   610 South Ninth Street            Fax: 916.492.2500

22  Las Vegas, Nevada 89101          **Southern Nevada Office:**

23  JHarper@danielmarks.net         601 South Seventh Street
   *Attorneys for Defendant Andrew Stocker*  Las Vegas, Nevada 89101

24                                 Phone: 702.387.8633

25                                 Fax: 916.492.2500
                               mwehsels@ltglaw.net

26                                *Attorneys for Defendant Andrew Clapper*

27  CHRISTOPHER CANDITO

28  5309 North Campbell Road

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1    Las Vegas, Nevada 89149
     canditochristopher@yahoo.com
2

3

4                              /s/ Kristen Freeman
                          Employee of LEWIS BRISBOIS
5                              BISGAARD & SMITH LLP

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28