**LAGOMARSINO LAW**
ANDRE M. LAGOMARSINO, ESQ. (#6711)
CORY M. FORD, ESQ. (#15042)
TAYLOR N. JORGENSEN, ESQ. (#16259)
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
aml@lagomarsinolaw.com
cory@lagomarsinolaw.com
taylor@lagomarsinolaw.com

**BAKER LAW OFFICES**
LLOYD W. BAKER, ESQ. (#6893)
500 S. Eighth Street
Las Vegas, NV 89101
Telephone: (702) 360-4949
Facsimile: (702) 360-3234
Lloyd@855bakerlaw.com

**CHRISTIAN MORRIS TRIAL ATTORNEYS**
CHRISTIAN M. MORRIS, ESQ. (#11218)
2250 Corporate Circle Suite 390
Henderson, NV 89074
Telephone: (702) 763-6909
Facsimile: (702) 920-7425
Christian@cmtrialattorneys.com
*Attorneys for Plaintiffs Mariah Maas,*
*Cade Slatsky, and Martin Slatsky*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MARIAH MAAS, as Special Administrator for the Estate of Tiffany Slatsky; MARTIN SLATSKY, as parent and legal guardian of CADE SLATSKY, a minor; MARTIN SLATSKY, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTOPHER CANDITO, an individual; ANDREW CLAPPER, an individual; NICHOLAS ROBISON, an individual; ANDREW STOCKER, an individual; CITY OF NORTH LAS VEGAS, a municipality; DOE DEFENDANTS I through XX, and ROE CORPORATIONS I through X, inclusive,<br><br>Defendants.<br>AND ALL RELATED CLAIMS. | CASE NO.:    2:22-cv-568-DJA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF NORTH LAS VEGAS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ECF NO. 111)** |

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

COME NOW Plaintiffs, and each of them, by and through their attorneys of record ANDRE M. LAGOMARSINO, ESQ. and TAYLOR JORGENSEN, ESQ. of LAGOMARSINO LAW, and hereby files *Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (ECF No. 111)*. This Opposition is made and based upon the pleadings and papers on file herein, the Points and Authorities attached hereto, and any oral argument that may be heard at the time of the hearing on this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.        INTRODUCTION**

This case arises from the tragic death of Tiffany Slatsky ("Slatsky"), its relation to Defendant City of North Las Vegas and its fire department ("CNLV"), and the lasting effects the conduct at issue had on Slatsky's son, parents, and sister. Slatsky became involved with the CNLV social scene after marrying Christopher Candito ("Candito"), who was a paramedic with CNLV. Unfortunately, that scene had no shortage of partying, illicit drugs, or misconduct. Now, after the parties have had an opportunity to engage in discovery and develop an evidentiary record, it remains clear that CNLV bears responsibility for what happened leading up to and following Slatsky's death.

Through a combination of unenforced policies and lack of oversight of its station houses and the medical supplies inside, failed leadership who were aware of serious misconduct amongst the department and chose to do nothing despite a duty to do so, and Candito's own egregious and reckless conduct while employed as a firefighter/paramedic with CNLV, Slatsky's family is now left to deal with the grief of losing their daughter, sister, and mother. As will be discussed in detail herein, the evidentiary record creates triable issues of material fact as to the elements of the claims at issue in this case. Therefore, summary judgment is not appropriate, and the Plaintiffs' are entitled to bring their case before a jury.

**II.       UNDISPUTED FACTS**

   **A.        Christopher Candito**

Defendant Christopher Candito ("Candito") was a certified paramedic for Defendant City of North Las Vegas ("CNLV"). *See* **Ex. 1, Deposition of C. Candito, 31:3-6.** As part of the

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

process of becoming employed with the CNLV fire department, Candito attended and graduated from the fire academy in 2008. *See* **Ex. 1, Deposition of C. Candito, 31:24 – 32:4.** Candito learned how to administer Narcan during paramedic school, but he received no thereafter despite being required to provide emergency medical services to individuals. *See* **Ex. 1, Deposition of C. Candito, 139:8-14;** *see also* **Ex. 2, Record of Continuing Education – Candito (CNLV001365);** *see also* **Ex. 3, Continuing Education – Narcan (CNLV001368-9).** Specifically, there is no evidence that Candito received any continuing education regarding Narcan's mechanism of action, the need for multiple doses, or the need for hospital-level medical care following administration of the drug to a patient suspected of overdosing. Candito's former coworkers in the CNLV fire department were unable to recall or confirm any continuing education regarding the use and administration of Narcan. *See* **Ex. 4, Deposition of S. Honsowetz, 27:15-18;** *see also* **Ex. 5, Deposition of A. Stocker, 67:20 – 68:9;** *see also* **Ex. 6, Deposition of A. Clapper, 33:11-16;** *see also* **Ex. 7, Deposition of M. Reyes, 26:21 – 27:6.**

Candito was considered a 'rover' who would move amongst different CNLV fire departments as needed. *See* **Ex. 1, Deposition of C. Candito, 33:24 – 34:1.** However, Candito testified that he was at Station 51 the most frequently. *See* **Ex. 1, Deposition of C. Candito, 34:2-4.** At Station 51, he worked with / under the previous individual defendants – Andrew Stocker ("Stocker"), Andrew Clapper ("Clapper"), Captain Nicholas Robison ("Robison"), and Stephen Honsowetz ("Honsowetz") - and Micah Reyes ("Reyes") in this case multiple times per year in his position as a rover. *See* **Ex. 1, Deposition of C. Candito, 34:5 – 35:13.** He also spent time with these individuals outside of work.

Candito, like all other CNLV fire department employees, was drug tested once prior to his employment with CNLV and never again after that unless they were involved in an accident on the job. *See* **Ex. 1, Deposition of C. Candito, 32:8 – 33:4;** *see also* **Ex. 17, Deposition of N. Robison, 28:10-15.**

### B.    Tiffany Slatsky

At the time of her death, Tiffany Slatsky was a twenty-five (25) year old mother who, up until the time she met Christopher Candito and became involved with his friends in the CNLV fire

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

department, lived a quiet life and spent most of her time with her family. *See* **Ex. 8, Slatsky Death Certificate (P000025).** Tiffany's son, Cade, was three years old and the two spent most of their time together. Tiffany's parents, Martin 'Marty' Slatsky and Tammara 'Tami' Slatsky, helped Tiffany care for Cade.

Prior to meeting Candito, Tiffany worked in luxury retail and ventured into real estate for a short time. Based on the testimony of Candito and her parents, Tiffany was not believed to have tried illicit drugs before she started dating Candito. *See* **Ex. 9, Deposition of M. Slatsky, 40:2-23;** *see also* **Ex. 1, Deposition of C. Candito, 188:24 – 189:1.** However, after she began dating (and eventually married) Christopher Candito, Tiffany Slatsky became involved in a scene that had a substantial cache of drugs at its disposal. A scene that directly involved many CNLV firefighters, particularly a group out of Station 51.

C.    The Party and Preparations

On February 21, 2020, Stocker, a firefighter from Station 51 and friend of Candito, hosted his birthday party (the "party") in a two-story suite at the Golden Nugget Hotel and Casino in Downtown Las Vegas. *See* **Ex. 10, Calvano Declaration of Warrant/Summons (CNLV010232-49), pg. 2.** Dozens of employees of the CNLV fire department were in attendance, including Candito, Honsowetz, and Robison. *See* **Ex. 11, Deposition of S. Honsowetz, Exhibit 4.** In preparation for the party, Candito, Robison, and Stocker were involved in a group text chat wherein they discussed all the illegal drugs that were purchased for and would be brought to the party for use by its attendees. This included cocaine (or coke), MDMA (or molly), and magic mushrooms. In the group message, Candito stated that he and Robison bought enough coke and molly to 'kill an elephant.' *See* **Exs. 1 and 12, Deposition of C. Candito, 61:8 - 66:18 and Ex. 35.**

Importantly, Robison, as a Fire Captain at Station 51, was considered a supervisor and was held to a higher level of responsibility under CNLV's Standards of Conduct. *See* **Ex. 22, Deposition of J. Calhoun (30(b)(6 Representative), 35:5-23;** *see also* **Ex. 23, Standards of Conduct (CNLV000252-5).** This included overseeing subordinates and reporting any illegal drug use, purchases, or mention of such activities. *See* **Ex. 22, Deposition of J. Calhoun (30(b)(6**

**Representative), 35:5-23.** This included illegal activity, such as drug use, which took place outside of work hours or by subordinates not usually assigned to that Captain's shift. *See* **Ex. 22, Deposition of J. Calhoun (30(b)(6) Representative), 35:24 – 36:16.** Instead of adhering to his responsibilities, Robison engaged in and encouraged such misconduct, opting not to punish subordinates for dangerous behavior or report it up the chain of command.

Stocker advertised the birthday party throughout the CNLV fire departments. *See* **Ex. 13, Tracksuit Party Advertisement.** He testified that he printed flyers and left them in each of the stations, including pinning them on fire department announcement boards and leaving numerous copies throughout common areas. *See* **Ex. 5, Deposition of A. Stocker, 174:12-18, 178:16 – 179:12.** The event was even placed on the official calendars in some of the stations. *See* **Ex. 5, Deposition of A. Stocker, 188:15 – 189:6.** The flyer advertised the party as being at the Golden Nugget and urged attendees to 'BYOB,' *i.e.,* to bring their own booze or beer. There is no evidence that anyone took the flyers down or counseled Stocker not to advertise the party at the stations.

Photos and testimony showed that there were several dozen individuals in attendance at Stocker's party. *See* **Ex. 11, Deposition of S. Honsowetz, Exhibit 4.** The party became big and loud enough that Golden Nugget security came to the suite and issued a noise warning at one point. *See* **Ex. 5, Deposition of A. Stocker, 182:9-23.** The party lasted into the early morning hours of February 22, 2020, at which point most of the attendees had left. *See* **Ex. 5, Deposition of A. Stocker, 168:3-6.** Between five and six in the morning, Slatksy's friend, Kayla Szabo, drove Slatsky and Candito back to their Henderson townhome. *See* **Ex. 1, Deposition of C. Candito, 127:17-24.**

D.    **Post-Party Events**

After leaving the party, Candito, Slatsky, and Szabo returned to Candito and Slatsky's residence in the Seven Hills area of Henderson, Nevada. The three were high on molly from the party, and they all went to the pool in Slatsky's and Candito's apartment complex. *See* **Ex. 1, Deposition of C. Candito, 127:25 – 128:6.** They also continued to drink alcohol. *See* **Ex. 1, Deposition of C. Candito, 128:12-14.** They also engaged in the use of cocaine. Around this time,

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864   Facsimile (702) 383-0065

Slatsky's son Cade returned home. *See* **Ex. 1, Deposition of C. Candito, 129:19-24.**

At some point, Slatsky complained about pain she periodically experienced because of an ulcer. *See* **Ex. 1, Deposition of C. Candito, 128:24 – 129:12, 130:13-16.** Supposedly following Candito's suggestion, she took Kadian pills, which is a brand of morphine that Candito had purchased from Clapper. *See* **Ex. 1, Deposition of C. Candito, 130:3-8.** It is unknown how many pills she took at that time. *See* **Ex. 1, Deposition of C. Candito, 130:9-10.** At some point thereafter, Candito noticed that Slatsky was slurring her words and acting strangely. *See* **Ex. 1, Deposition of C. Candito, 130:20 – 131:4.** Based on his training in emergency medicine, Candito determined that Slatsky was overdosing. *Id.* In response, he decided to drive her over twenty miles across town to CNLV - Station 51[1]. *See* **Ex. 1, Deposition of C. Candito, 131:15-17.** Candito testified that this was, at least in part, based on his belief that the hospitals would have just made Slatsky sit in a waiting room because she was still breathing, still had a pulse, and responded to stimuli. *See* **Ex. 1, Deposition of C. Candito, 130:20-131:17, 206:18 – 207:9.**

Once Candito arrived at Station 51, he entered the locked gate and entry door with a code and key card that he was in possession of only as a direct result of his employment with Defendant CNLV. *See* **Ex. 1, Deposition of C. Candito, 132:7 – 134:1.** CNLV had no working security cameras on the property, so it is unclear where exactly everyone was at the point that Candito arrived. However, it is clear that no one at the station was assigned to be awake and/or monitoring the station, which allowed Candito to enter the property unnoticed and remain unnoticed until he left.

Once inside of Station 51, Candito accessed the EMS bags stocked on each fire department vehicle, or apparatus. *See* **Ex. 1, Deposition of C. Candito, 134:5-25.** The EMS bags were freely accessible to anyone inside of the station – they were not in a locked compartment of the vehicles, nor were the vehicles themselves locked while at the station. *Id.* Candito took Narcan, Zofran, and IV equipment from the EMS bag. *See* **Ex. 1, Deposition of C. Candito, 135:7-8.** The EMS bags were restocked daily with refills from the medical supply room at Station 51. Because there were

---

[1] St. Rose – Dominican Hospital was a less than five minute drive from Candito and Slatsky's home.

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864   Facsimile (702) 383-0065

no working security cameras or alarm systems on the property and no one was assigned to be on watch at the station or any area within the station, Candito was able to arrive and leave the area undetected. *See* **Ex. 1, Deposition of C. Candito, 135:1-6.**

The medical supply room itself was unlocked and accessible to anyone inside the station, whether they were cleared to use the supplies inside or not. *See* **Ex. 1, Deposition of C. Candito, 130:9-10;** *see also* **Ex. 7, Deposition of M. Reyes, 71:24-25.** Once inside the room, the supplies themselves were in unlocked plastic containers and accessible by anyone. *See* **Ex. 1, Deposition of C. Candito, 135:21-24.** Even though these supplies were purchased using, in part, tax-payer money, were the responsibility of the CNLV fire department, and largely required trained professionals to administer, CNLV had no mandate that its employees track the supplies themselves, despite their carte blanche access. While weekly inventories were conducted, it was just to ensure that the station had the bare minimum amount of each type of supply that they needed. *See* **Ex. 1, Deposition of C. Candito, 136:6 – 137:4.** In Station 51, the only measure taken to keep track of the supplies used was a yellow legal pad, where an individual who took any kind of supply was supposed to write down the name of the supplies and the quantity taken. *See* **Ex. 14, Photos of Station 51 – EMS Supply Room Inventory Pad.** CNLV employees were not required to write down who took the supplies, when the supplies were taken, or any kind of identifying information such as a serial number. *See* **Ex. 7, Deposition of M. Reyes, 70:18 – 71:23;** *see also* **Ex. 4, Deposition of S. Honsowetz, 114:24 – 115:13.** CNLV had no way to track whether supplies were being used properly.

After getting the supplies to treat Slatsky, Candito returned to his truck and drove to a nearby parking lot. *See* **Ex. 1, Deposition of C. Candito, 137:18 – 138:1.** There, he treated Slatsky with the Narcan, which he only learned how to administer during his initial paramedic training. *See* **Ex. 1, Deposition of C. Candito, 139:8-10.** However, Candito had relatively few instances of administering Narcan in his professional career (he estimated five total over twelve years) and was not aware, despite his training and few encounters since, that he needed to take Slatsky to the hospital to receive continuing care. *See* **Ex. 1, Deposition of C. Candito, 141:3-12, 183:13-18.** Further, he testified that his understanding of why they took patients to whom they

administered Narcan to the hospital was for billing purposes. *See* **Ex. 1, Deposition of C. Candito, 141:16 – 144:7.** Candito could not recall, and his training records did not support, any additional training regarding the proper administration of Narcan, the need for additional doses, or the mechanism of action which led to those requirements. *See* **Ex. 2, Candito Training Record re: Narcan;** *see also* **Ex. 15, Candito Training Record;** *see also* **Deposition of C. Candito, 139:11-14.**

Slatsky's affect improved after she was administered Narcan. *See* **Ex. 1, Deposition of C. Candito, 144:12-17.** Candito then drove her back across town to the townhome, where he watched her for a while and then went to sleep. *See* **Ex. 1, Deposition of C. Candito, 144:18-20.** Around 8:00 am on February 23, 2020, Candito woke up to find that Slatsky was unresponsive. *See* **Ex. 1, Deposition of C. Candito, 145:1-6.** At that point, Kayla Szabo, who remained at the residence while Candito took Slatsky to Station 51 and back, called 911, and Candito started CPR. *See* **Ex. 1, Deposition of C. Candito, 145:11-12.** Once EMS arrived, they took over CPR and began administering medical care. *See* **Ex. 1, Deposition of C. Candito, 146:10 – 147:5.** EMS took Slatsky to St. Rose Hospital, but she ultimately passed away from what was determined to be multi-drug intoxication with a likely emphasis on morphine overdose. *See* **Ex. 1, Deposition of C. Candito, 147:21-23;** *see also* **Ex. 16, Coroner's Report.**

Candito was arrested and criminally charged with manslaughter, for which he served time in High Desert State Prison. He testified that, at the time of the events at issue here, he was not concerned that he would be in trouble with his employer had he taken Slatsky to the hospital for an overdose. *See* **Ex. 1, Deposition of C. Candito, 215:5-12.**

In the aftermath, Marty and Tami Slatsky adopted Cade, who know refers to them as Mom and Dad. *See* **Ex. 9, Deposition of M. Slatsky, 12:13-24.** Cade struggles with significant behavioral and emotional issues, likely because of the trauma of his mother's death. *See* **Ex. 9, Deposition of M. Slatsky, 13:7 – 14:5.** Marty and Tami, along with Slatsky's sister Mariah Maas, also suffered significantly in losing their daughter and sister.

### E.    CNLV's Response After the Fact

Following the news of Slatsky's death, CNLV asked that Fire Captains check each station's

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

inventory of Narcan. *See* **Ex. 17, Deposition N. Robison, 8:11-22.** Candito was also terminated a short time thereafter. It seems that any further immediate action by CNLV stopped there.

There is no evidence that any of the party attendees were drug tested despite there being evidence of illicit drugs at the party. *See* **Ex. 17, Deposition of N. Robison, 138:19-25.** CNLV also did not interview the party attendees following news of the incident to get a better handle on what occurred. *See* **Ex. 17, Deposition of N. Robison, 30:12-17;** *see also* **Ex. 7, Deposition of M. Reyes, 64:11-16.** Stocker was not investigated for his role until August 2021, over a year after Slatsky's death. *See* **Ex. 5, Deposition of A. Stocker, 37:5-13.** Robison was terminated for unrelated reasons before he was investigated for his involvement in, and knowledge of, the illicit drug use at the party. *See* **Ex. 17, Deposition of N. Robison, 28:16-23.** Honsowetz was not interviewed about the party until February 18, 2022, two years after the party. *See* **Ex. 18, Honsowetz Investigative Interview (Honsowetz0019-24).**

## III.   DISPUTED FACTS

### A.   The Culture of Station 51

The culture of Station 51 and the extent / knowledge of illicit drug use therein, and within the CNLV fire department generally, is disputed. Candito testified to several incidents of drug use outside of the February 21, 2020 party, including several incidents of drug use with Andrew Stocker; drug use with Micah Reyes; knowledge of drug use by and discussion about illicit drugs with Nicholas Robison; drug use with Stephen Honsowetz; drug purchase and sale with Andrew Clapper; and knowledge of the 'party days' of the older generation of firefighters at CNLV. *See* **Ex. 1 Deposition of C. Candito, 27:9-13, 37:19 – 38:4, 48:20 – 49:14, 52:16-24, 63:15 – 64:7, 84:25 – 85:24, 96:18-20**. Candito further testified that it was his impression that the group of people he hung out with, whom he classified as the younger generation within the CNLV fire department, was known for partying and that the frequency at which they went out together was even brought up in the fire station at least once. *See* **Ex. 1, Deposition of C. Candito, 126:11 – 127:1.**

Irina Hansen, the former wife of a CNLV battalion chief, testified under oath that she personally witnessed misconduct in the form of women, who were allegedly 'entertainers' on the

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

strip, hanging around at a CNLV fire station and 'partying' with the crew. *See* **Ex. 19, Deposition of I. Hansen, 44:5-14.** Hansen stated that although her husband witnessed this occurring, he took no steps to stop it. Hansen herself witnessed it and even witnessed these same 'entertainers' went into the men's dormitories. *See* **Ex. 19, Deposition of I. Hansen, 49:23 – 50:24.** Hansen further testified to stories of drugs going missing off of the CNLV apparatus at Station 51 and that her ex-husband stated once that, if the entire fire department got drug tested, they would not be anyone left. *Id.* at 66:5-22 and 67:6-22. She also testified that he himself had used illicit narcotics. *Id.* at 68:4 – 70:3.

During the Department of Justices's investigation, information regarding potential involvement with drugs over an extended period of time by certain individuals within the CNLV fire department also came to light. *See* **Ex. 20, DOJ Redacted Documents (Under Seal).** The DOJ also obtained information that during his first marriage, Candito did not hang out with his firefighter co-workers often. After the divorce, however, when he began to hang out with these individuals more, it was reported that Candito began to party more, hang out in strip clubs, and use drugs. *Id.* at P005440. These are activities that Candito admitted to engaging in with his co-workers. DOJ records also indicate concerns by CNLV fire department employees about "[t]housands of pills" (P005448, 5450-2). There are also records of communications regarding the 'frequent' use of ecstasy by CNLV firefighters, as well as the use of mushrooms, cocaine, and morphine. (P005456)

In deposition testimony from Joseph Calhoun, one of CNLV's 30(b)(6) witnesses, Calhoun testified that there was no policy requiring an employee to report suspected or known employee misconduct, with the exception being a supervisor over a subordinate (like Robison), during the relevant time period. *See* **Ex. 22, Deposition of Joseph Calhoun (30(b)(6) Representative), 67:5-10.** Further, he stated, that there were no repercussions following this incident for failing to report coworker misconduct, such as the drug use. *Id.* at 67:14-16. Specifically, Calhoun testified that they wanted to have a culture where people felt like they *should* report such misconduct, but not that they would *require* it. *Id.* 67:14-24.

**B.     Drug Use at the Party**

The overall extent of who used illicit substances at the February 21, 2020 party is disputed. The presence and types of illegal drugs at the party are not disputed, but those alleged to have witnessed and/or used these drugs, except for Candito, have denied their involvement despite the abundance of evidence, including text messages, inferring otherwise. Evidence also suggests that Robison, who was a Fire Captain with CNLV and aware of Candito and Stocker's representations that drugs would be present at the party, also reportedly brought cocaine with him to the party, which Candito and Slatsky used, though he denied as much in his own deposition.[2] *See* **Ex. 1, Deposition of C. Candito, 58:24 – 59:20.** Candito, Slatsky, Honsowetz, and Honsowetz's girlfriend were among the guests that were still there by 2:00 am. *See* **Ex. 1, Deposition of C. Candito, 125:6-20.** Candito testified that, at this point, the group took molly and mushrooms. *See* **Ex. 1, Deposition of C. Candito, 37:24 – 38:4.**

**C.     Opinions of CNLV's Expert Witnesses**

While in dispute, the unsworn expert opinions set forth in CNLV's Motion for Summary Judgment are not to be considered by law in determining whether to grant summary judgment.[3]

**IV.     LEGAL STANDARDS**

**A.     Summary Judgment Standard**

Summary judgment is **only** appropriate when the pleadings and admissible evidence "show that there is **no genuine issue as to any material fact** and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)) (emphasis added). A fact is considered material for the purposes of precluding summary judgment if it might affect the outcome of the case, and a dispute is genuine if a reasonable trier of fact could resolve the issue in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of undisputed facts, therefore,

---

[2] At least some of the illicit drugs purchased by Candito were obtained from Clapper, who also worked for the CNLV fire department.

[3] Plaintiffs' opposition to the 'undisputed facts' presented by CNLV, on MSJ 6:17 – 7:20, as they relate to CNLV's liability involve legal argument and will be addressed herein. However, for the record, Plaintiffs dispute this content by CNLV.

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864   Facsimile (702) 383-0065

does not immediately make summary judgment appropriate. Summary judgment is inappropriate if different ultimate inferences could be drawn by a reasonable trier of fact based on the same undisputed facts. *Braxton-Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (9th Cir. 1985).

It is the burden of the movant to establish that no genuine issue as to any material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All facts must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587. In order to successfully rebut a motion for summary judgment, the non-moving party must point to facts supporting by the record which demonstrates a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 13J,* 208 F.3d 736 (9th Cir. 2000). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang,* 711 F.2d 141, 143 (9th Cir. 1983).

Parties must include a concise statement setting forth each fact material to the disposition of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence on which the party relies. Local Rule 56-1.

### B.    Municipal Liability Under § 1983

#### 1.    Custom, Policy, or Practice

A government entity may be held liable for a violation of an individual's constitutional rights if the governmental entity's policy, practice, or custom was the moving force behind that violation under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs. Of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018 (1978). In order to establish liability for governmental entities under *Monell,* a plaintiff must prove "(1) that the plaintiff possessed a constitutional right of which they were deprived; (2) that the municipality had a policy, practice, or custom; (3) that that policy, practice, or custom amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy, practice, or custom is the moving force behind the constitutional violation." *Dougherty v. City of Covina,* 654 F.3d 892, 900 (9th Cir. 2011) (citing *Plumeau v. Sch. Dist. No. 40 Cnty. Of Yamhill,* 130 F.3d 432, 438 (9th Cir. 1997)). Liability should be founded on practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy. *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996).

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

"Official policy" means a formal policy, such as a rule or regulation adopted by the defendant, resulting from a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986). An act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. *Monell,* 436 U.S.

### 2.    Failure to Train

Failure to train may amount to a policy of "deliberate indifference" if the need to train was obvious and the failure to do so made a violation of constitutional rights likely, even without a pre-existing pattern of violations. *See Connick v. Thompson,* 563 U.S. 51. 62-64 (2011); *see also City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197 (1989). Evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting obvious potential for such a violation, could trigger municipal liability. *Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1392 (1997).

A plaintiff bringing a failure to train claim must first demonstrate that the existing training program was inadequate, keeping in mind that the adequacy of a particular program must be resolved in relation to the tasks the particular employees must perform. *See Merritt v. County of Los Angeles,* 875 F.2d 765, 770 (9th Cir. 1989). A training program will be deemed inadequate if it does not "enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.*

### 3.    Ratifying Unconstitutional Conduct

A municipality may be held liable under § 1983 when "the individual who committed the constitutional tort was an official with final policy-making authority" or such an official "ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore,* 979 F.2d 1342, 1346-7 (9th Cir. 1992). If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

decision is final. *City of St. Louis v. Prapotnik,* 485 U.S. 112, 127 (1988). A local government can be held liable under § 1983 "only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Id.*

### C.    Employees Acting Under the Color of State Law

Title 42 U.S.C. § 1983 provides a cause of action for those deprived of constitutionally or statutorily protected rights, privileges, and immunities, and seeks to deter state actors from using their authority to deprive individuals of said rights. *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). A plaintiff bringing a § 1983 claim must allege (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Identifying state action for the purposes of § 1983 liability is a highly fact-specific determination that follows no rigid formula. *McDade v. West,* 223 F.3d 1135, 1139 (9th Cir. 2000). An individual acts under the color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Naffe v. Frey*, 789 F.3d 1030, 1036 (9th Cir. 2015); see also *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir.1991) ("'[I]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the state.'") The analysis turns on "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Anderson v. Warner*, 451 F.3d 1063, 1068 (2006) (citing *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)).

This test is generally satisfied when state employees wrong someone "while acting in [their] official capacity or while exercising [their] responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988); see *Naffe*, 789 F.3d at 1037 (9th Cir. 2015) ("a state employee who is on duty, or otherwise exercises his official responsibilities in an off-duty encounter, typically acts under color of state law."). **That is true even if the employee's offensive actions were illegal or unauthorized.** *Naffe*, 789 F.3d at 1037.

# V.   LEGAL ARGUMENT

### A.   CNLV Impermissibly Cites to Unsworn Expert Testimony to Support its Argument for Summary Judgment.

As an initial matter, unsworn expert testimony is not admissible to support or oppose summary judgment. *Shuffle Master, Inc. v. MP Games LLC,* 553 F.Supp.2d 1202, 1210 (D. Nev. 2008). The purpose of allowing affidavits or declarations at summary judgment is to consider testimony that would be admissible at trial. *Id.* To be admissible, testimony must be sworn. Fed. R. Civ. P. ("FRCP") 56(e); Fed. R. Evid. ("FRE") 603. It clearly follows, and is well-established, that an unsworn expert report, and the opinions therein, are inadmissible. *Shuffle Master, Inc.,* 553 F.Supp.2d at 1210. To that extent, the expert opinions which CNLV relies on throughout its Motion for Summary Judgment are not supported by sworn declarations and **cannot** be relied upon to bolster Defendant's position nor considered by the Court in coming to a decision. Specifically, this applies to the following:

1. The opinions of John Peters used to support CNLV's contention that it maintained sufficient policies and procedures relevant to Plaintiffs' claims. MSJ, 12:27 – 13:27.
2. The opinions of John Peters used to support CNLV's contention that it sufficiently and appropriately trained its EMTs, including Candito. MSJ, 16:25 – 17:7.
3. The opinions of John Peters used to support CNLV's contention that Candito was not acting within the course and scope of his employment. MSJ, 27:22 – 28:17.
4. The opinions of Dr. Michael Curtis used to support CNLV's contention that Candito was not acting within the course and scope of his employment. MSJ, 28:18 – 29:6.
5. The opinions of Robin McKinley used to bolster CNLV's contention that Candito was not acting within the course and scope of his employment. MSJ, 29:7-31:12.

This is established law, and the Court must not consider this purported evidence in determining whether to grant summary judgment here. As such, Plaintiffs will only address the extent that these opinions are relied on by CNLV to make its argument for summary judgment, but Plaintiffs will not spend time at this point rebutting or opposing the opinions because CNLV has

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

not met its initial burden as it relates to providing authenticated, sworn evidence.

Should the Court consider the unsworn opinions offered by Defendant CNLV, Plaintiffs offer the initial and rebuttal report of James Reyes, who rebutted Dr. Peters opinions and therefore shows that Dr. Peter's opinions are disputed. *See* **Ex. 24, Initial Report of James Reyes;** *see also* **Ex. 25, Rebuttal Report of James Reyes.**

**B.    CNLV Impermissibly Fails to Cite to Factual Support to All of its Contentions.**

The party seeking summary judgment must inform the court of the basis for its motion and identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). If the moving party fails to meet its initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

Plaintiffs point out to the Court that the alleged undisputed facts in CNLV's Motion for Summary Judgment ("MSJ") are sparsely attributed to specific locations in the evidentiary record. To that extent, the Plaintiffs ask that the Court consider CNLV's failure to meet the specific burden imposed on it at the summary judgment stage.

**C.    Plaintiffs do not Argue that the Eighth Judicial District has Issued an Order on the Issue of Candito's Claim for Indemnity.**

Plaintiffs concede that, following the ruling in the Eighth Judicial District Court, Candito is not entitled to indemnification from CNLV to the extent and on the bases set forth in the related order. *See* **Ex. 21, Order re: Candito's Motion for Indemnification.** Plaintiffs further concede that *respondent superior* does not apply under § 1983 liability standards.

**D.    There is a Genuine Issue of Fact as to Whether CNLV is Liable for a Civil Rights Violation as a Municipality.**

**1.    There is a genuine issue of material fact as to whether CNLV had sufficient policies and procedures related to Plaintiffs' claims.**

CNLV asserts that it maintained sufficient policies regarding 'prohibited' drug use and standards of conduct so as not to be responsible for what it characterizes as the single violation represented by this case and Slatsky's ultimate death. CNLV relies, in part, on the opinion of Dr.

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

Peters in supporting its argument. When Dr. Peters's opinion is removed, CNLV ultimately relies on the testimony of CNLV Fire Department Chief Calhoun.

Here, there is no question that CNLV had a policy prohibiting drug use and other improper conduct, at least symbolically. The question, however, is whether there was an overarching custom and practice during this same time period of allowing CNLV fire department employees to engage in unchecked drug use and misconduct despite this policy, their job duties, and the level of access they had to various medications and supplies. The testimony in this case shows that while Slatsky's passing may have been the first high profile death as a result of this conduct within CNLV, it was not the first time that CNLV employees had engaged in this conduct nor that it was the first time it was known by supervisors who were required and able to report it, but did not.

First and foremost, Chief Calhoun testified that CNLV had no policy requiring its employees to report coworker misconduct, no CNLV employees were penalized for failing to report the misconduct alleged in this case, and no CNLV employees who were at the party were drug tested. In other words, **no one was penalized for failing to report drug use, CNLV did not maintain a policy which required such reporting, and CNLV took no steps to determine the extent of this drug use amongst its employees.** This is despite the CNLV fire department being a public safety organization which provides emergency medical treatment. Further, CNLV did not interview those individuals who were at the party, aside from during the limited-scope disciplinary proceedings for Stocker and Honsowetz months later, to get a better idea of what occurred or who all may have been involved. This information seriously undermines CNLV's claim that it had sufficient policies and procedures related to drug use and misconduct in place because it creates a genuine issue of material fact as to whether those policies and procedures were enforced or just symbolic, which precludes summary judgment here.

While that alone precludes summary judgment, Candito also testified that the group of CNLV employees he spent time with were known as the party group. He further testified that he knew about the party days of the 'older generation' firefighters, including drug use. Additionally, text messages to, from, and including Candito, Stocker, Clapper, and Captain Robison showed knowledge of drug possession, purchase, sale, and use not only leading up to and at the party, but

well before. Candito also testified that he knew Captain Robison could get him ketamine, an illegal drug, well before the party ever occurred. This was supported not only by Candito's testimony, but in a text message he sent to Slatsky relaying the same. *See* **Ex. 1, Deposition of C. Candito, 72:21-25.** Importantly, Candito testified that he felt he would not get in trouble for using illegal or illicit drugs if he did not get in an accident and about the existence of a have "your brother's back type of environment" that expected CNLV fire department employees to look the other way at misconduct. *See* **Ex. 1, Deposition of C. Candito, 155:1-12, 160:4-8.** Cumulatively, this evidence also supports the existence of a triable issues of material fact as to whether there was a custom of not enforcing the 'no drug' policy in such a way that CNLV firefighters were under the impression that they could engage in this conduct without fear of consequences.

Additionally, the evidentiary record in this case establishes that CNLV allowed unfettered, untracked, and uncontrolled access to its station houses and the medical supplies inside by employees as a direct result of their positions with CNLV. In this case, Candito was able to access Station 51 undetected, as there were no cameras or assigned watch, and take medical supplies from EMS bags on one of CNLV's vehicles. CNLV did not mandate that its employees track these medical supplies, and had Slatsky not died, CNLV would not have even known that Candito accessed the Narcan, IV equipment, and Zofran. This policy, or lack thereof, provided the mechanism by which Candito accessed the medical supplies he used to provide insufficient medical care to Slatsky. Without this access, Candito likely would not have attempted to go to Station 51 at all.

Further, there is sworn testimony from Irina Hansen that she personally witnessed, as far back as 2018, inappropriate conduct and potential drug use by firefighters at Station 51 in the form of fraternizing with unknown females at the station house. Hansen further testified that she witnessed her husband, a CNLV fire department Chief at the time, allow the behavior to continue. Additionally, the DEA investigation into Slatsky's death attributed statements to relevant parties about "thousands of pills" passing through their hands. This, too, supports the existence of a genuine issue of material fact as to the extent and length of time that this behavior was ongoing and allowed to continue, especially considering that a CNLV Fire Captain was shown to be aware

LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

of the behavior. That information is important because it undermines CNLV's argument that it had sufficient policies and procedures addressing drug use.

For the reasons discussed above, triable issues of material fact exist here and summary judgment is inappropriate.

### 2.    It is disputed whether CNLV sufficiently trained its EMS personnel, including Candito.

CNLV asserts that it sufficiently trained its EMS personnel, and that Candito's error in attempting to treat Slatsky's overdose is insufficient to show that there was a program wide training inadequacy. However, Candito's error is not the only evidence that points to constitutionally inadequate training, and the evidence uncovered during the course of this case shows that there is a genuine issue of material fact as to whether training regarding the use and administration of Narcan was sufficient to avoid the obvious constitutional violations of a person's right to life that could result from CNLV's failure to train on the same. Again, CNLV relies, in part, on the unsworn opinions of Dr. Peters in making this argument. When that source is put aside, the remaining evidence includes select testimony excerpts from the former individual defendants and testimony from CNLV Deputy Chief Justin Campbell.

Failure to train may amount to a policy of "deliberate indifference" if the need to train was obvious and the failure to do so made a violation of constitutional rights likely, even without a pre-existing pattern of violations. Here, Plaintiffs argue that there is a genuine issue of material fact as to whether the evidence shows that the lack of sufficient continuing education and training regarding the use and administration of Narcan amounted to deliberate indifference. Plaintiffs first assert, and they are not under the impression that CNLV disagrees, that it would be deliberately indifferent to fail to adequately train EMS personnel in how to properly administer life-saving measures, such as Narcan, which they are expected to provide to patients they encounter in the course and scope of their job. As it relates to Narcan specifically, this would include adequate training and re-training on the mechanism of action, the length of time for which it is effective, the proper steps to take after administering the medication, and why those are the proper steps. Failure to provide adequate training on this issue is obviously likely to end in constitutional violations of

the rights of individuals that EMS personnel encounter and treat with Narcan. This is similar to the need to adequately train police officers in the constitutional use of firearms, where the failure to do so is obviously likely to lead to misuse ending in death.

None of the now-dismissed individual defendants – Stocker, Honsowetz, and Clapper – were able to confirm that they received any form of refresher training on the use and administration of Narcan following their graduation from the fire academy. Candito also testified that he did not receive additional training on the use and administration of Narcan. Further, in response to Plaintiffs' discovery request for the same, the only evidence of training completed by Candito from December 1, 2016 through the date of Slatsky's death which related to the use and administration of Narcan was one PowerPoint slide which identified Narcan as 'drug antagonist' but contained no further information. Candito, despite his training, also testified that he did not know that an individual treated with Narcan needs to receive continuing medical care because Narcan wears off before opioids do. *See* **Ex. 1, Deposition of C. Candito, 183:13-18.** He further stated that he was under the impression that Slatsky would be fine following the single dose of Narcan he administered to her. *See* **Ex. 1, Deposition of C. Candito, 183:19-22.** Despite this lack of constitutionally adequate training, CNLV allowed unfettered and untracked access to EMS supplies such as Narcan and IV equipment.

During his deposition, Stocker testified that how often EMS personnel administered Narcan was unpredictable, stating "you could do it five times one month, and then not touch it for a year". *See* **Ex. 5, Deposition of A. Stocker, 70:2-10.** For his part, Candito, testified to administering Narcan about five times in the twelve years he worked in EMS. Given the stark possibility that EMS personnel could go a significant amount of time without having to administer Narcan and then experience numerous instances of administration, there is an obvious need for continuing training so that EMS personnel are prepared to properly administer Narcan. Here, there is a genuine issue of material fact as to whether such training was provided by CNLV.

Finally, despite the fact that Candito was not trained to perform criminal acts, he was 'trained,' or should have been, in administering Narcan *and* afforded untracked, unchecked access to drug through his employment. Here, his actions in providing emergency medical care to Slatsky

paralleled his actions in the course of his job with CNLV.

As such, summary judgment is not appropriate on this point.

### 3. It is disputed whether CNLV ratified unconstitutional conduct.

CNLV asserts that there is no genuine issue of material fact as to whether CNLV ratified unconstitutional conduct relevant to Plaintiffs' claims. To the extent that CNLV impermissibly relies on unsworn expert opinions, it must be set aside and may not be considered by the Court.

Similar to how there is a genuine issue of material fact as to whether CNLV actually enforced its policies against drug use, there is a genuine issue of material fact as to whether such conduct went ignored and unpunished, therefore creating an environment which allowed there essentially ratified the conduct leading up to and contributing to Slatsky's death. Specifically, Candito testified that there was a 'watch your brother's back' type of environment within the CNLV fire department which encouraged employees to look the other way at misconduct. Additionally, he testified that he was not under the impression he would end up in trouble for using illegal drugs unless he got in an accident of some sort while on the job. This is supported by the fact that Robison, a Fire Captain who was in charge of supervising and reporting subordinates, knew about such activity and failed to address it. This supports the existence of an environment within CNLV which did not adequately address misconduct and therefore ratified its continuance.

Although Robison was not a policy-maker with final authority, he was responsible for overseeing subordinates and was the go-between from subordinates to higher ranking individuals. As testified to by Honsowetz, battalion chiefs and above typically dealt with the Captains, such as Robison, instead of directly with the firefighters and paramedics. *See* **Ex. 4, Deposition of S. Honsowetz, 37:2-21.** If Robison was the link between subordinates such as Candito, Stocker, and Clapper and the higher-up policy makers, and expected to discipline those same subordinates for misconduct as testified to by Calhoun, but failed to discipline or report such conduct despite knowing, he too ratified this conduct and allowed it to go on.

As such, summary judgment is inappropriate on this point.

### E. There is a Genuine Issue of Material Fact as to Whether Candito Acted Within the Course and Scope of his Employment at any Time Relevant to Plaintiffs'

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

**Causes of Action.**

CNLV asserts that it is not liable for Christopher Candito's conduct because he was not acting within the scope of his employment at any time relevant to Plaintiffs' causes of action. CNLV relies heavily on unsworn expert opinions in supporting its argument, all of which must be put aside under established precedent.

The facts here are similar to those in *Rockwell v. Sun Harbor Budget Suites,* wherein the Nevada Supreme Court held that an issue of material fact existed as to whether an off-duty security guard acted within the scope of his employment when he shot and killed a resident of the apartment property which he guarded after she attempted to end an affair with him. *See generally* 112 Nev. 1217. Plaintiffs presented evidence which showed the security guard was still actively guarding the premises even though he was off-duty and that off-duty guards responded to emergency situations on premises. *Id.* at 1226. The record also indicated that the security guard used his radio to call apartment security to report the shooting and that an off-duty security guard heard the call and responded. *Id.* Evidence to the contrary suggested that off-duty security guards were not required to respond to emergency calls and that their free time was their own, which would mean that the guard had not been engaged in the business of his employer, and his employer would not be liable for his conduct. *Id.* Given the conflict, the Court held it was ultimately a determination for the finder of fact. *Id.*

Here, as in *Rockwell,* there is a genuine issue of material fact as to whether Candito was acting within the course and scope of his employment with CNLV. Candito's conduct was in line with his job duties despite being off-duty at the time of the conduct described herein, *e.g.* providing emergency medical care. Specifically, Candito issued medical care to Slatsky to treat her overdose, which he was trained (although inadequately) and expected to do as a paramedic. Additionally, Candito used supplies provided to him by his employer for use in the scope of his employment, specifically the Narcan and IV equipment which he obtained from Station 51. Further, CNLV employees were expected to use their training and capabilities to protect the public at all times. *See* **Ex. 23, CNLV General Rules of Conduct (CNLV000256).** Ultimately, whether Candito's conduct satisfies the course and scope requirement is a question for the finder of fact. As

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864    Facsimile (702) 383-0065

in *Rockwell,* this is sufficient to rebut CNLV's request for summary judgment on this issue.

**F.      There is a Genuine Issue of Material Fact as to Whether Candito Acted Under the Color of State Law at Any Time Relevant to Plaintiffs' Causes of Action.**

CNLV asserts that Candito was not acting under the color of state law at any time relevant to Plaintiffs' causes of actions. Again, to the extent that CNLV asserts this position based on unsworn expert testimony, it must be put aside for the purposes of determining whether summary judgment is appropriate on this point.

Even when an employee's actions are illegal or unauthorized, they may be deemed to have acted under the color of state law if they were exercising their responsibilities pursuant to state law. *McDade v. West,* 223 F.3d 1135 (9th Cir. 2000)*,* is an analogous Ninth Circuit case which is instructive on this issue. In McDade, the defendant (Ms. West) illegally used the password issued to her by virtue of her position with the state to access an otherwise secured database and obtain information of purely personal interest. *Id.* The defendant would not have been able to access the database, or the information therein, had she not been an employee of the state and provided a password. *Id.* at 1140. The court recognized that, even though the defendant acted with purely personal motive, she had acted under the color of state law. Specifically, the court held Ms. West acted under color of state law because she "abused her responsibilities and purported or pretended to be a state officer during the hours in which she accessed the computer." *Id.* at 1141. Because Ms. West's status as a state employee enabled her to access the information at issue, she invoked the powers of her office to accomplish the offensive act. *Id.* at 1140. "Therefore, however improper Ms. West's actions were, they clearly related to the performance of her official duties." *Id.*

Here, there is at least a genuine issue of material fact as to whether Candito was acting under the color of state law, regardless his motives. There is no dispute that Candito was only able to access Station 51 and the medical supplies inside as a result of his position with CNLV. Just as in *McDade,* Candito abused his responsibilities and purported to be a state officer when he accessed Station 51 and obtained medical supplies to provide emergency medical care to Slatsky. That he could have accessed Narcan in a different location is irrelevant here because he did not do

LAGOMARSINO LAW

3005 W. Horizon Ridge Pkwy., #241, Henderson, Nevada 89052

Telephone (702) 383-2864      Facsimile (702) 383-0065

that. Instead, he used the access to Station 51 that he only had as a result of his employment with CNLV to obtain medical supplies and provide emergency medical care to Slatsky. Then, as a result of insufficient training on the administration of Narcan, he took her back home, where she passed away.

CNLV vaguely cites the "factual record developed during discovery," without pointing to specific locations, to argue that there is no question that Candito was acting as a private citizen and not under the color of law. However, there is clear case law which creates a genuine issue of material fact on this point, and, as such, a reasonable jury could find that Candito was abusing his power as a state employee in entering Station 51 on February 22-23, 2020. As such, summary judgment is not appropriate on this issue.

## VI.    CONCLUSION

For the reasons discussed herein, there exist genuine issues of material fact that preclude a grant of summary judgment as to each argument that CNLV has presented. Further, CNLV failed to abide by FRCP 56 by and related case law by failing to cite to sworn evidence and only occasionally citing specific evidentiary excerpts which support their factual contentions. Plaintiffs therefore ask that this Court deny CNLV's motion for summary judgment in its entirety.

DATED this 22nd day of August, 2025.

LAGOMARSINO LAW

ANDRE M. LAGOMARSINO, ESQ. (#6711)
TAYLOR N. JORGENSEN, ESQ. (#16259)
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
Facsimile: (702) 383-0065
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5, I hereby certify that on this 22nd day of August 2025, I served a true and correct copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF NORTH LAS VEGAS'S MOTION FOR SUMMARY JUDGMENT** on all parties to this action via CM/ECF electronic service, to the following:

Robert W. Freeman, Jr., Esq.
E. Matthew Freeman, Esq.
**LEWIS BRISBOIS BISGAARD & SMITH**
matt.freeman@lewisbrisbois.com
robert.freeman@lewisbrisbois.com
kristen.freeman@lewisbrisbois.com
*Attorneys for Defendant*
*City of North Las Vegas*

Christopher Candito
canditochristopher@yahoo.com
*Pro Se*