# EXHIBIT 1 –

## Excerpts of the Deposition Transcript of Christopher Candito

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MARIAH MAAS, as Special )
Administrator for the Estate )
of Tiffany Slatsky; MARTIN )
SLATSKY, as parent and legal )
guardian of CADE SLATSKY, a ) Case No.
minor, ) 2:22-cv-00568-GMN-DJA
)
    Plaintiffs, )
)
    vs. )
)
CHRISTOPHER CANDITO, an )
individual; ANDREW CLAPPER, an )
individual; NICHOLAS ROBISON, )
an individual; ANDREW STOCKER, )
an individual; STEVEN )
HONSOWETZ, an individual; )
CITY OF NORTH LAS VEGAS, a )
municipality; NORTH LAS VEGAS )
FIRE DEPARTMENT, a City of )
North Las Vegas agency; )

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF CHRISTOPHER CANDITO

Taken on Thursday, January 25, 2024

At 10:11 a.m.

Held at Lewis Brisbois Bisgaard & Smith, LLP

6385 South Rainbow Boulevard, Suite 600

Las Vegas, Nevada  89118

NV Firm No. 028F

Reported By: Gale Salerno, RMR, RVR-MS, CCR No. 542

A.   Yes.

Q.   How often?

A.   He lived in the same apartment complex as me.  So it was pretty frequent.

Q.   Were there other fire department employees that came and visited you at that address prior to Tiffany's death?

A.   No.

Q.   What would you and Defendant Stocker do when he came over to your house?

A.   When he came over, one time we did mushrooms.  And the other time he had a friend that he brought over, a girlfriend.

Q.   Do you recall what the girlfriend's name was?

A.   No.

Q.   And what would you and Mr. Reyes do when he came over to your house?

A.   We would just talk.  Probably -- we would have beers.

Q.   So the specific incident where you and Defendant Stocker did mushrooms, who provided the mushrooms?

A.   I don't know.  I don't know if it was the girl he was with or if it was me.  I don't know.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 31

licenses or certifications?

A.   No.

Q.   At the time of Tiffany's death, what professional licenses and certifications did you hold?

A.   Paramedic certification.

Q.   And are you currently working?

A.   No.  Not right now.

Q.   So you previously --

MR. GATES:  I'm sorry, what was the answer?

THE WITNESS:  Not currently.

MS. JORGENSEN:  Did you hear that, Mr. Gates?

MR. GATES:  I did not.  I'm having a difficult time.  I've put on a set of headphones to see if that helps, but not much.

THE WITNESS:  Not currently.

BY MS. JORGENSEN:

Q.   But you did previously work for the North Las Vegas Fire Department, correct?

A.   Yes.

Q.   And when did you begin working there?

A.   January of 2008.

Q.   Is that when you -- did you begin the academy in 2008 or is that when you had completed it?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 32

A.   Yes.

Q.   You began the academy --

A.   Yes.

Q.   -- in 2008?

And did you have any disciplinary issues while in the fire academy?

A.   No.

Q.   Were you drug tested while in the fire academy?

A.   No.

Q.   And how long did you work for the fire department in total?

A.   Twelve years.

Q.   So you stated that you were not drug tested during the academy.  Were you drug tested at any point during your time with the fire department?

A.   It was a condition of employment.  But other than that, no.

Q.   So if I'm understanding you correctly, you were drug tested once at the beginning?

A.   Yes.

Q.   And then at no point after that?

A.   Correct.

Q.   Do you know if the fire department had a policy surrounding drug testing?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 33

A.   Yes.

Q.   What did you understand that policy to be?

A.   If you were involved in a vehicle accident, then they had the right to drug test you.

Q.   Were you ever involved in a vehicle accident?

A.   No.

Q.   Were you ever aware of any instances where an employee was involved in a vehicle accident but wasn't drug tested?

A.   I can't recall.

Q.   Did you know of any of your coworkers at the fire department being drug tested during the time you were there?

A.   I can't recall a specific time.

Q.   So my understanding of kind of the academy is that you rotate through four different stations during that first year; is that accurate?

A.   That sounds about accurate, yes.

Q.   Do you recall what stations you cycled through during that time?

A.   I believe it was three stations for me.  It was 51, 52 and 53.

Q.   And after you completed that first year, were you assigned to a particular fire station?

A.   No.  I was a rover.

Q.   Were you at any specific fire station more frequently than others?

A.   51.

Q.   Did you ever work the same shift as Defendant Stocker while you were with the fire department?

A.   Yes.

Q.   How frequently did that happen?

A.   Oh, you mean the same station?  I can only recall one time having worked in the same station.

Q.   How were you introduced to Defendant Stocker?

A.   Just -- it must have been more than one time because it was work.

Q.   Do you recall ever working the same shift at the same station as Defendant Clapper?

A.   Yes.

Q.   Would you be able to give me an estimate of how often that happened?

A.   Maybe three or four times a year.

Q.   Did you ever work the same shift at the same station as Defendant Robison?

A.   Yes.

Q.   How frequently did that happen?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 35

A.   More frequently.  Maybe ten times a year.

Q.   And in those situations, were you working under Defendant Robison as a firefighter, he was a captain?

A.   Correct.

Q.   Did you ever work the same shift at the same station as Micah Reyes?

A.   Yes.

Q.   How frequently did that happen?

A.   That was more frequent as well.  Maybe ten times a year.

Q.   And what about with Steven Honsowetz?

A.   Yeah.  Same, ten.

Q.   So during your time at the fire department after the academy and your probation, did you receive any disciplinary action?

A.   No.

Q.   Do you recall ever receiving negative performance reviews?

A.   No.

Q.   Was there anyone at the fire department that you didn't get along with during your time there?

A.   There was a bit, yeah.

Q.   Let's narrow it down this way.  Was there

A.   I don't recall.

Q.   And what did you tell Mr. Stover during that interview?

A.   The extent of the situation.

Q.   Did you tell Mr. Stover about the party?

A.   Probably.

Q.   Do you recall anything specific that you told Mr. Stover about the party?

A.   No.  I know that I left out other people's involvement with illicit drugs.

Q.   Can you tell me who you left out?

A.   It would have been Micah Reyes and -- well, no, Micah didn't actually do drugs at the party.  I'm trying to -- Steven Honsowetz.  That's really the only one at the -- oh, and Andrew Stocker.

Q.   Did you witness Defendant Robison engaging in illicit drug use at the party?

A.   No.

Q.   Did you observe anyone else using illegal or illicit drugs at the party?

A.   Just those two.

Q.   Steven Honsowetz?

A.   Steven Honsowetz and Andrew Stocker.

Q.   What drugs did Steven Honsowetz use, to your knowledge?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 38

A. Mushrooms.

Q. And what drugs did Andrew Stocker use, to your knowledge?

A. Mushrooms.

Q. Do you recall who brought the mushrooms?

A. Me.

Q. And where did you get them?

A. Dealer.

Q. Did anyone ask you to bring the mushrooms?

A. I don't remember.

Q. So you resigned from the fire department after your interview with Mr. Stover, correct?

A. Yes.

Q. Were you advised by anyone to resign?

A. No. Not advised.

Q. I want you to take me just briefly through your job experience prior to working for the fire department. So before you started working for the fire department, what were you doing?

A. I was hired pretty young. I was only 20. So I worked at Costco immediately before that. And I worked as an electrician apprentice before that.

Q. So before working for the fire department, no other positions with medical involvement --

A. No.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 48

Q. This account was under Amanda's name?

A. Correct.

Q. But just to be clear, this is you sending these messages?

A. Correct.

Q. Okay. Looking at the blue messages, can you verify that the number listed there was Tiffany's phone number prior to her death?

A. Yes.

Q. Do these appear to be true and correct copies of these messages --

A. Yes.

Q. -- to the best of your knowledge?

So I want to look at this first page and if you look down at the bottom right-hand corner, there's those little numbers. Those are called Bates numbers. And I'll use those to refer to specific pages in the exhibits.

A. Okay.

Q. Now, I want to look at that first page, P001870. And specifically the first green message on that page. Can you please read that?

A. "Stocker is going to come over tomorrow night and do Ambien and hydrocodone with me and smoke pot."

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 49

Q.   Do you recall if that night happened?

A.   Yes.

Q.   And did you observe Defendant Stocker using Ambien or hydrocodone?

A.   Yes.

Q.   Did he use both of those substances?

A.   You know what?  I don't -- I don't know.

Q.   So to the best of your knowledge, did he use -- did you witness him use at least one of those substances or what did you see?

A.   I believe so.

Q.   And did you see Andrew Stocker use marijuana during that evening?

A.   I don't recall.

Q.   During that evening, who -- who had supplied the Ambien?

A.   Me.

Q.   What about the hydrocodone?

A.   Me.

Q.   Where had you gotten those substances?

A.   The Ambien I believe was from -- I regret to admit, but there was -- people would discard medications at the fire station and that was one of the discarded medications.

The hydrocodone was from a surgery I had

Christopher Candito ～ January 25, 2024
* * * Videotaped Deposition * * *

that or track it?

A.   No.

Q.   Would people just literally come in and drop it in the trash can and leave?

A.   They would come and give it to us.  It was supposed to be a safe place to discard it.  And I mean, there may have been a protocol, you know, but I don't know it off my head.

But yeah, then we would just take it and put it in the trash can.

Q.   Do you recall any other instances where you and Defendant Stocker used Ambien together?

A.   No.

Q.   What about hydrocodone?

A.   No.

Q.   Do you recall any instances where you and Stocker -- or you witnessed Defendant Stocker using any other illegal or illicit drugs that we haven't discussed already?

A.   MDMA.

Q.   How many times did you witness that?

A.   Once.  And then at the party it was mushrooms.  Oh, I'm sorry, and mushrooms one other time with him.

Q.   Did he ever talk to you about using MDMA

the Golden Nugget Hotel on February 21st, 2020."

Did I read that correctly?

A.   Yes.

Q.   Who asked you to get molly and coke at the party?

A.   I have no idea.

Q.   Did you ultimately bring molly and cocaine to the party?

A.   Yes.

Q.   And just for the record, molly is --

A.   MDMA.

Q.   MDMA?

A.   Yes.

Q.   And did you tell Defendant Stocker that you were going to be bringing molly and coke to the party?

A.   I believe so.

Q.   What did you do with the molly and the coke when you got to the party?

A.   The cocaine, I don't know if we used it or if -- there was already cocaine at the party.  But I don't know if we used it or not.

The MDMA, I know we took some there.

Q.   So you said there was already cocaine at the party?

A.   Uh-huh.

Q.   Did you see it?

A.   Yes.

Q.   Where was it?

A.   It was in a drawer in the upstairs bedroom or loft area.

Q.   When you say a drawer, do you mean like a chest of drawers where you put clothes or --

A.   I think it was a chest of drawers, yeah.

Q.   And was it just in a bag upstairs in the drawer?

A.   No.  It was in the -- it's called a bumper I believe is what it's called.

Q.   And what did that look like?

A.   Maybe like a little chapstick container, similar.  That's the easiest way to describe it.

Q.   Do you know who brought that cocaine?

A.   Robison.

Q.   And how do you know that?

A.   He told me.

Q.   And then you said you took some of the molly at the party, correct?

A.   Tiffany, myself and Kayla did.

Q.   Did you give molly to anyone else at the party?

use in the bathroom?

A. No.

Q. I'm going to give you what's been previously marked as Exhibit 35.

(Exhibit 35 was marked for identification.)

BY MS. JORGENSEN:

Q. I'll let you know ahead of time, the texts on this exhibit are blurry and almost impossible to read.

A. Okay.

Q. So it's paired with the grand jury transcript and stuff in those same text messages. We'll kind of go through that page by page.

A. Okay.

Q. So go ahead and take a minute to review that.

A. I can't read it.

Q. So if you go to the next page, it's paired with some grand jury transcript.

A. Okay.

Q. But take a minute to review the whole exhibit and then we'll go through it.

A. Review the whole document?

Q. Yeah. You can just kind of look through

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 62

the pages so you know what's coming.

A.   Okay.  I gotcha.  I get the gist of it, yeah.

Q.   All right.  So just for context ahead of time, the grand jury transcript that is paired with these text messages includes testimony from Special Agent Behar, which is spelled B-e-h-a-r.

So I want to start on page 3 of this exhibit, Bates number CNLV000128.  It's going to be discussing the two messages that were ahead of it.

Starting specifically at line 21, Q is the prosecutor; A is Special Agent Behar.

So starting at line 21, it states:  "So this is now a conversation between Candito and Robison?

"Answer:  That's correct."

Do you know Robison as Nicholas Robison?

A.   Yes.

Q.   Did you refer to him by any nicknames?

A.   Robi.

Q.   And how long have you known Defendant Robison for at the time of the party?

A.   Twelve years.

Q.   Would you consider him a friend, an acquaintance at that point?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 63

A.   I mean, more so an acquaintance than a friend.

Q.   Was most of your interaction through work?

A.   Yes.

Q.   The next line on this page starting at 24:

"Question:  And Robison says can't get any K.  Getting 8 ball.  Based on your training and experience, is this colloquial terms for narcotics?

"A.  Yes."

Do you know if K is street terms for any type of narcotic?

A.   Ketamine.

Q.   And what about 8 ball?

A.   That's a quantity of cocaine.

Q.   Did you talk to Defendant Robison about getting drugs for the party?

A.   In this conversation.

Q.   How did you -- how did you learn that you were able to talk to Defendant Robison about illegal or illicit substances?

A.   I know the time I mentioned about doing it at Top Golf, I know that he had mentioned that he could get ketamine.  And I don't know if friends that knew that I did -- that I had a -- you know, that I did drugs.  I don't know if some of his -- you know,

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 64

they were also friends with him, they knew that he did.  I don't remember how the conversation started, but...

Q.   So do you remember any of the context of around why he brought up he could get ketamine?

A.   He was just telling -- I had never done it and he was saying that he could get it.

Q.   So leading up to that, had you two been discussing drug usage generally?

A.   Never prior to that conversation.

Q.   But during the conversation at Top Golf, do you recall discussing other drug usage generally with Defendant Robison?

A.   Not specifically, no.

Q.   Do you recall when this Top Golf event happened?

A.   No.

Q.   Do you know if it happened within a year of Tiffany's death?

A.   It was when -- it was the first time that she met any of my friends.  So it would have been pretty close to when we first started dating.

Q.   If we go to lines 3 through 8 on this page, CNLV000129.

"Question:  And then Candito, moving

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 65

forward, this is now February 17th, so closer to the party?

"Answer:  Yes.

"Question:  And he is saying Friday night is going to be insane.  We're partying downtown.  We have enough coke and molly to kill a pack of elephants."

Did I read that correctly?

A.    Yes.

Q.    Do you recall sending a text message to that effect?

A.    I knew that it was sent, but I don't remember it specifically.

Q.    So outside of -- strike that.

So was it your understanding that Defendant Robison was going to purchase illegal or illicit substances for the party?

A.    Yes.

Q.    And was that understanding based off of the conversation that's being referenced in this exhibit?

A.    Correct.

Q.    Did anyone else tell you that they were going to be obtaining illegal or illicit substances for the party?

A.    No.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 66

Q.   If we go to the next page of this exhibit, CNLV000130, line 4.

"Question:  So verbatim he says, we are honestly going to need a drug room.  Robi and I bought so much God damn coke and molly, it's insane.

"Answer:  Yes.

Did I read that correctly?

A.   Yes.

Q.   Did you speak with Defendant Robison outside of these text messages about purchasing illegal or illicit substances for the party?

A.   I think there was a phone call originally.

Q.   Do you remember what was discussed on that phone call?

A.   He was just asking if I was going to get anything, and if he -- he was just telling me what he was bringing.  I mean, it was pretty much just summed up in those text messages.

Q.   Did he -- did Defendant Robison ask you if you could get any specific substance for the party?

A.   No.  I think he was just asking what I was going to bring, that way he knew how much to bring.

Q.   Were there any conversations between yourself and Defendant Robison, you know, between the time of that Top Golf event and the party where you

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 67

discussed illegal or illicit substances?

A.   No.

Q.   So now you categorized Defendant Robison as more of an acquaintance.  Did you, you know, talk to him outside of work very often?

A.   Not really.  I think that may have been the first time he ever texted me, to be honest.

Q.   And if you did see Defendant Robison outside of work, what was -- what was happening? What was going on?

A.   Well, we always had guy nights, you know. So he may have been at a few of those.  But he lives out of state or lived out of state, so I didn't see him too often.

Q.   And when you would have these guy nights, what did that consist of?

A.   Just -- I had my core group of friends that we would go out regularly.  And there was times where it was just like open invite, if anybody wants to go out, we're going to a bar or whatever.

Q.   How frequently would you go out like that with your core group of friends?

A.   Two, three times a week.

Q.   And you mentioned bars.  Would you have guys night at strip clubs?

A.   It wasn't very common, but...

Q.   If you did go to strip clubs, were there specific places that you went?

A.   The Palomino.

Q.   Any reason why?

A.   No.  Not really.

Q.   Do you recall ever going to nightclubs on a guys night?

A.   No.

Q.   And did you ever, you know, meet any of Defendant Robison's ex-partners?

A.   Like wives?  What do you mean?  No.

Q.   Yeah.  Just generally, ex-romantic partners.

A.   No.  You know what, he dated a doctor that I went to, but that was it.

Q.   So on that note in Defendant Robison's deposition, he had testified that he had caught you stealing from his fiancee's -- I believe her name was Christie Thomas, her office.

A.   Correct.

Q.   Can you tell me about what happened there.

A.   I was remodeling my house and I needed some markers and there was like some markers in a cup.  I took some markers and put them in my pocket.  I went

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 72

Q.   I'm going to give you Exhibit 38.

(Exhibit 38 was marked for
identification.)

BY MS. JORGENSEN:

Q.   Let me know when you've had time to review that.

A.   Yeah.

Q.   So again, do these appear to be true and correct copies of messages between yourself and Tiffany?

A.   Yes.

Q.   I want to look at those first two messages from you in the green.  Can you go ahead and read those out loud, please?

A.   "Would it be okay if I went to Stoney's on Thursday with some guys from work.  The crew I really want to work with invited me and it would be nice to kind of make myself part of that crew if I hang out with them."

Q.   Can you read that second message, please?

A.   "Is that captain that thought he could get ketamine?  He invited me."

Q.   Is the captain that thought he could get ketamine Defendant Robison?

A.   Yes.

his name was.

Q.   Was he a guy outside your kind of core group that you had discussed before?

A.   Yeah.

Q.   Do you recall, by chance, what his rank was?

A.   He was a paramedic firefighter.

Q.   And do you know if he worked out of Station 51?

A.   He did, yes.

Q.   Do you recall when this happened?

A.   That was like two nights before me and Tiffany got married.

Q.   Did you ever hear anyone else in the fire department talk about molly or MDMA?

A.   My group of friends did.

Q.   Okay.  Did it seem to you that the fire department was -- you know, kind of had its like kind of little clicks almost, like --

A.   Absolutely.

Q.   -- groups of guys that hung out together? Okay.

Can you tell me about the other groups of -- you know, that kind of hung out together?

A.   Well, there was the -- I guess there was

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 85

the older crowd.  There was admittedly the group of guys that I hung out with, we were kind of the party boys.  But yeah, I mean, the fire department, it kind of goes by generations, you know.  So each generation kind of had their group of guys that hung out when they were younger.

Q.   Did you know of any other groups of guys, groups of friends that, you know, tended to party?

A.   Even some of the older guys.  I mean, it was -- you know, there was stories of them when they were younger having been a little wild.

Q.   Like who?

A.   Ray Kessler.  He retired.  Gary Stover. There was a few.

Q.   Do you recall any other names?

A.   Brian Freemal.

Q.   So Kessler, Stover, Freemal.  Anyone else?

A.   No.  There was never specific talk about drugs, but I believe that that was common with them.

Q.   What made you -- what gave you that impression, I should say?

A.   I knew Brian Freemal.  He told me one time he had a story about him being on a boat with girls and there being cocaine everywhere.

Q.   And what about -- you said it kind of goes

Did I read those correctly?

A. Correct.

Q. Then I'll go ahead and have you read the next two messages.

A. "Dunno. Micah's wife/girlfriend is going to be outta town so we're going hard. We'll get drunk and I'm sure molly will come up."

Q. Next message is from Defendant Clapper's number. It states: "Hahaha. Have fun."

Okay. So in that top message on 1795, it states: "Dunno. Micah's wife/girlfriend is going to be out of town so we're going hard."

Is the Micah in that text Micah Reyes?

A. Yes.

Q. And do you recall the night that this is referencing at all?

A. No.

Q. How frequently did you do molly with Micah Reyes prior to Tiffany's death?

A. I can only recall twice.

Q. Going now to 1796. And this will go through 1801. Go ahead and review those and let me know when you've had enough time.

A. Yeah. Oh, through 81?

Q. Yeah, 801, correct.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 125

Tiffany use at the party?

A.   All three of those.

Q.   And were you trying to, you know, kind of hide the fact that you were using substances at the party?

A.   Well, see, when we say the party, it extended into the night.  We stayed there overnight until the morning.  Most people left.

The cocaine, yeah, obviously we were hiding.  But once everybody left and there was just a few people there, that's -- we all took mushrooms. And then once Kayla came later on in the night, she wanted to take molly and so that's when we took a molly.

So there wasn't any hiding of those later on.

Q.   And who was in that group that had kind of stayed late?

A.   Andrew Stocker, Steven Honsowetz, his girlfriend, and Tiffany and I.

Q.   At any point during the party, so that night and leading into the next morning, did anyone ask you for illegal or illicit substances?

A.   No.

Q.   Did you offer illegal or illicit

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 126

substances?

A.   Well, I take that back.  Yeah, at the party, Steven Honsowetz and Andrew Stocker did.

Q.   And was this the first time that you had been to a party with other fire department employees?  Nonwork-related party I should say?

A.   We -- I mean, it was almost like every week was a party.  You know, we had gatherings where we would drink and do stuff.  But that was the first birthday party really.

Q.   Did you get the sense that it was kind of well known that your group liked to go out and party like this?

A.   Yes.

Q.   What gave you that impression?

A.   We were the -- the party boys, I guess.  We were, you know...

Q.   Did anybody ever, you know, like confront you about that, ask you about it?

A.   It was brought up in conversation a little bit.

Q.   And what conversations, if you recall?

A.   I just remember it, you know, being talked about at the dinner table that we always went out.

Q.   While you were at the station?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 127

A.   Yes.

Q.   Okay.  Do you recall any conversation about illicit or illegal drug use while you were physically at the fire station?

A.   No.

Q.   Okay.  So I want to walk through everything that you recall from after the party to the point that Tiffany was taken to the hospital.  Okay?

A.   Okay.

Q.   So you mentioned that the party extended overnight and into the next morning, and yourself, Tiffany and Kayla stayed overnight, correct?

A.   Yes.

Q.   Okay.

A.   And Steven Honsowetz, yes.  Actually, they left, but it was probably about 2:00 or 3:00 a.m.

Q.   Okay.  And what time during the morning of February 22nd did you leave?

A.   I believe it was like 6:00 a.m.

Q.   How did you get home?

A.   Kayla drove us.

Q.   And did you go straight home from the party?

A.   Yes.

Q.   So when you got home, what did all three of

you do?

A. I know -- see, I don't remember if it was before we left that we had taken some molly or if it was -- I just know at some point that morning that we were, you know, we were high on molly. And we went out and sat by our pool.

Q. And the molly that you took, whether it was at the party or at the apartment, had you secured that molly for the party?

A. Yes. If not -- personal use later if we didn't take it there.

Q. Were you still drinking during this time period?

A. Yes.

Q. And how long did you sit by the pool for?

A. I don't recall.

Q. What did you do after the pool?

A. I know -- I think we kind of were just sleeping off everything.

Q. And were you all downstairs at the house?

A. Yeah.

Q. At some point you went to Smith's, correct?

A. Yes.

Q. Okay. And why did you go to Smith's?

A. Tiffany had an ulcer and her -- she had --

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

it was, it was acting up.  Her stomach was hurting her.  So -- oh, I'm sorry.  So I got her some food, like I thought some chips might help her.

Q.    And about what -- at what point on the 22nd did you go to Smith's, if you recall?  Like what time of day?

A.    I don't remember.

Q.    What did you --

A.    The timeline is fuzzy to me because I feel like it was in the daytime.  But I know her ulcer was acting up at night.  To be honest with you, I wasn't in my real mind so I don't recall exactly.

Q.    That's fine.  Just to the best of your recollection.

A.    Okay.

Q.    So after, it sounds like you guys had kind of woken up, right, gotten some snacks.  What did you do after that?

A.    Well, the three of us, I think we kind of were sleeping on different, you know, time periods. And I know her son came home at around -- I remember it was around like 3:00 p.m.  I remember making -- Tiffany was still sleeping.  I remember making him some food and hanging out with him for a little bit.

And Kayla was still there.  I think it was

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 130

just kind of, you know, a lazy day, to be honest with you.

Q.   And then at some point, Tiffany took morphine pills; is that correct?

A.   Correct.

Q.   And were those the pills that you had purchased from Andrew Clapper?

A.   Correct.

Q.   Do you recall how many she took?

A.   No.  She didn't tell me.

Q.   Do you remember why she took them?

A.   Her ulcer.

Q.   And you know, from what you observed, did Tiffany frequently have pain as a result of her ulcer?

A.   Yeah.  It was mostly when she drank.

Q.   Had Tiffany been prescribed morphine pills before?

A.   No.

Q.   And after that, you observed that Tiffany was showing signs of an overdose; is that right?

A.   I actually had been sleeping.  When I woke up, she had -- yes, she had slurred speech and...

Q.   So you said slurred speech?

A.   Yeah.  And she was an unsteady gait.  I

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 131

don't know how to put it.  She was walking, loss of,
I don't know.

Q.   Motor function?

A.   Yes.  Motor function.

Q.   I'm going to ask you to speak up just a
bit.

A.   Sorry, sorry.

Q.   You're fine.

Do you know about how much time had passed
between when she took the morphine pills and when you
had kind of noticed these symptoms?

A.   I don't know.

Q.   You were asleep?

A.   Yeah.

Q.   And at that point, you decided to take her
to the fire station; is that correct?

A.   Yes.

Q.   I'm going to give you Exhibit 39.

          (Exhibit 39 was marked for

          identification.)

BY MS. JORGENSEN:

Q.   These are photos taken from the Station 51
inspection for this case.  So I'll just kind of go
through them with you and I'll have some questions
about them.  Okay?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 132

A.    Okay.

Q.    All right.  So the first picture on this exhibit, Bates stamped P005509, is taken outside of Station 51.

Do you recognize this area?

A.    Yes.

Q.    So when you first got to the station, did you have to go through this gate in the picture to get to the parking lot?

A.    Yes.

Q.    And that gate required a code, correct?

A.    Correct.

Q.    Where did you get that code from?

A.    We needed it to get through the gate, so it was common knowledge.

Q.    Did you get that code once you started working for the fire department?

A.    That code didn't -- wasn't originally on there, I don't believe.  I don't believe they had a key pad originally.  I think the gate just opened and closed.  Whenever they put in the key pad is when I got the code.

Q.    At the time that you took Tiffany to the fire station, was there a key pad on the gate?

A.    Yes.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 133

Q. And to the best of your knowledge, this gate code wasn't just given out to the public, right?

A. Not to the public, no.

Q. And there's only one entrance into Station 51 that firefighters used while you were working there, correct?

A. Correct.

Q. Go a couple of pages in. P005513. Does this appear to be that entrance?

A. Yes.

Q. And you had only accessed this door through that parking lot area we just looked at, correct?

A. Correct.

Q. And this door required an access card to open, correct?

A. Yes.

Q. Who provided you with an access card for this door?

A. The department.

Q. Did you receive that card once you started working for the fire department?

A. Yes.

Q. Is it your understanding that only fire department employees had cards to get into the station?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 134

A.   Yes.

Q.   If we go to P005515.  Is this the room that the door opened up into?

A.   Yes.

Q.   So once you got into the fire station, did you go into the EMS supply room?

A.   No.

Q.   Where did you go?

A.   Into the bags on the truck.

Q.   So the bags on the truck, like where were they kept?

A.   In the truck.  In the compartment on the truck.

Q.   Okay.  So she had a specific compartment?

A.   Yes.

Q.   And were -- I guess I'll call them the apparatus.  Did each of the trucks or each of the different apparatus have an EMS bag on board?

A.   Yes.

Q.   Okay.  And the compartment that they were kept in, was that compartment ever locked?

A.   No.

Q.   Were the different trucks or apparatus ever locked while they were in the station?

A.   No.

Q.    And to your knowledge, were there any security cameras around the station?

A.    No.

Q.    When you went into the station that night, did you see anybody?

A.    No.

Q.    What did you take from the EMS bag?

A.    Narcan and IV equipment.

Q.    Now, if you were in -- you know, if you were working at Station 51 and you needed to access Narcan outside of the bags, where would you go to do that?

A.    Say that one more time, I'm sorry.

Q.    If you were working at Station 51 and you needed to access Narcan and not go into the EMS, where would you go to do that?

A.    The EMS supply room.

Q.    And did you ever experience the EMS supply room at Station 51 to be locked?

A.    No.

Q.    The supplies that were kept in those rooms, did you ever experience them to be kept in locked containers?

A.    No.

Q.    Did anybody -- was anybody assigned at

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Station 51 to keep watch over the EMS supply room?

A. No.

Q. Was anybody assigned to kind of keep watch over the trucks?

A. No.

Q. Was there any sort of inventory system in place at this time when you had gone to the station with Tiffany where you would have to write down, you know, that you took this out of the EMS bag and you were the one who took it and this was why?

A. No.

Q. So was it possible for somebody to just, you know, during the day take something and nobody would be -- nobody would know?

A. Weekly we would do an EMS inventory and we would just make sure everything was stocked up. But normally after every call, if we used something, we would get back to the station and put it back.

Q. So when you say there was a weekly inventory, was there any -- like did you cross-check with how many, you know, Narcan you had and how many is reported on calls and do those numbers match up?

A. No. If we were below the amount that, you know, we were supposed to have, then we would just contact EMS, the EMS supervisor, and ask to be

restocked.

Q.   Okay.   So the point of the inventory was just to make sure that there was enough?

A.   A bare minimum, yes.

Q.   Okay.   Why did you take Tiffany to Station 51?   Why not a different North Las Vegas fire station?

A.   From where I lived, that was the closest one.

Q.   And where was Tiffany while you were inside Station 51?

A.   She was in the truck.

Q.   Where was the truck?

A.   In the parking lot.

Q.   And the truck was in the parking lot inside that first gate?

A.   Yes.

Q.   Once you had all the supplies, did you go back to the truck at that point?

A.   Yes.

Q.   And at that point did you administer the Narcan?

A.   I drove to a parking lot nearby.

Q.   Where was that parking lot?

A.   I want to say -- it's off of Las Vegas

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 138

Boulevard. Just a little south of Carey.

Q. And part of your job as a paramedic was to administer emergency care, correct?

A. Yes.

Q. Did you complete any specific training regarding how to administer Narcan?

A. There had been training for it, yes.

Q. What do you recall about that training?

A. The way that I was trained to give Narcan was to only give it -- well, not only give it, but to give it if the patient's respiratory rate is decreased and only give them enough to bring their respiratory rate back so that they are still sedated and they don't put up a fight bringing them into a hospital.

Q. Do you recall receiving any training about, I guess, the method of how Narcan works?

A. Yes.

Q. What do you recall about that training?

A. That it blocks the opioid receptors in the brain.

Q. And do you recall any training regarding how long Narcan works for?

A. No.

Q. So at the time that you administered Narcan

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 139

to Tiffany, did you have any knowledge surrounding how long Narcan worked for?

A.   No.   My -- I mean, we would give it to patients on the street if we knew they had a problem. And we never said you have to call 911 if you are given this because this isn't going to last long, you know.

Q.   Do you recall when you completed training regarding how to administer Narcan?

A.   Paramedic school.

Q.   Did you recall any like continuing education classes about that during your time at the fire department?

A.   No.

Q.   I'm going to give you Exhibit 40.

(Exhibit 40 was marked for identification.)

BY MS. JORGENSEN:

Q.   You can go ahead and review that.

A.   Okay.

Q.   And do you recognize these documents?

A.   I've never seen them before.  I mean, they look like maybe training that I have -- I've had, but in this format, I've never seen it like this.

Q.   Look at the second page of this exhibit,

after you administer naloxone?

A. No.

Q. Do you recall any times during your --
while you were working with the fire department where
you administered Narcan outside of the incident with
Tiffany?

A. Yes.

Q. How many times do you recall?

A. Maybe five times.

Q. And is that maybe five times over like the
12 years that you were there?

A. Yes.

Q. And after you administered the Narcan,
would you take those individuals to the hospital?

A. Yes.

Q. What was your understanding at the time of
why you took them to the hospital?

A. The fire department had become about
transport billing, and the way I was trained was
to -- that's why we left them sedated was because we
were trying to collect the insurance money for taking
them to the hospital.

Q. And how did you -- how did you come to
learn that?

A. Learn what? What part of it?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 142

Q.   That you were taking them to the hospital in order to collect the billing.

A.   Well, they were pushing for transportation to the hospital, the EMS transportation to the hospital.

Q.   And how were they --

A.   On all patients.  Sorry.

Q.   You're fine.

How was the fire department doing that, how were they getting that message across?

A.   They were pushing.  We had a minimum amount of transports we were supposed to do a day.  And then when people weren't meeting that, then they started prioritizing certain calls private ambulance wouldn't even respond to.  They were pushing for transports in every way that they could.

Q.   Did you see -- I guess what I'm trying to get at is like did you see any memos to that effect?

A.   No.  But there was -- I mean, there was guidelines in place.  They were figuring out how to transport more and more given the resources they had, and they were -- you know, at one time it was we had to do three transports a day and another time it was, you know, only delta calls so that -- I didn't see any memos saying you have -- you know, you have to

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 143

transport, but there was -- they were changing how they did it just so they could transport.

Q.   Were you ever instructed to transport to the hospital any call where you had to administer Narcan?

A.   It was never put in that -- like in those terms.  But yeah, I mean, that's why -- if I had a patient that was normally -- that was talking and walking, if they didn't want to go to the hospital, then, you know, they -- they didn't -- then I wouldn't -- they would just sign an AMA and then we would let them go.

But if they -- I wouldn't -- we wouldn't give Narcan to a patient like that.  If they wanted to go, then we would just take them and put them on the gurney and take them.

Q.   And correct me if I'm wrong --

A.   Sorry, I got off there.

Q.   No, you're okay.

Correct me if I'm wrong, what I'm getting from what you're saying is that your understanding of why you took patients to the hospital after administering Narcan was so that the fire department could collect transport billing?

A.   Well, we -- we advised almost every patient

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 144

to go to the hospital no matter the severity of the situation.

And yes, my understanding at the time -- or at least the way I perceived how I had been trained was that we were giving Narcan just enough, leave them still sedated so we get them to the hospital and we can make that money on their transport.

Q.   Okay.  So in this situation with Tiffany after you administered the Narcan, you then went back to your house, correct?

A.   Correct.

Q.   And what was -- what was Tiffany like after you had administered the Narcan?

A.   Completely normal.

Q.   Was she exhibiting any signs of an overdose at that point?

A.   No.

Q.   And what happened once she got home?

A.   I watched her for a while.  And then we ended up going back to sleep.

Q.   Was Kayla still there at that point?

A.   Yes.

Q.   And do you recall about what time you got home?

A.   I don't.

Q.   So you went back to sleep.  What time did you wake up next?

A.   I believe it was like 8:00 a.m.

Q.   And that's when you noticed that Tiffany was unresponsive, correct?

A.   Correct.

Q.   Did you notice immediately or did some time pass?  How did that work?

A.   No.  I saw her and I could see her color was off.

Q.   And what did you do at that point?

A.   I told Kayla to call 911 and I started CPR.

Q.   You moved Tiffany outside while you were waiting for the ambulance, correct?

A.   Correct.

Q.   Why did you do that?

A.   So when I -- Tiffany was the ideal patient for -- we had two types of patients:  A load and go or a stay and play.  And Tiffany was a patient that we consider a load and go.  She was an ideal healthy patient.  Just had one cause of her sickness was Narcan.

So her being in cardiac arrest, I wanted to get her to the hospital as soon as possible.  When I heard sirens, I thought it was an ambulance initially

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 146

and I brought her out thinking that we would just load and go, and it ended up being a fire engine.

Q. How long was it until the ambulance got there?

A. They were right next door, so it was pretty quick.

Oh, the ambulance versus the fire engine?

Q. Yes.

A. Oh, it was a little bit after.

Q. And when the fire engine got there, did any of the firefighters, did they begin administering medical care?

A. Yes.

Q. What were they doing?

A. Immediately they started CPR.

Q. So did they take over for you at that point with CPR?

A. Yes.

Q. Now, once the fire engine and the ambulance arrived, they moved Tiffany back inside; is that correct?

A. Correct.

Q. Did they tell you why they did that?

A. I think it was just more private than being out on the sidewalk, you know.

Q.   Did you observe them while they started administering medical care?

A.   They took her from me and started doing it. But the police department was right there with them and they kind of kept me from going back inside.

Q.   So what were you doing during the time that the paramedics were administering medical care inside?

A.   I was just going crazy outside.

Q.   Did you call anyone at that point?

A.   No.  I didn't have my phone.

Q.   Do you recall talking to anybody during that time?

A.   While they were providing care?  Because I was outside for a while while the police department did the -- they tore my house apart.

Q.   Yeah, let's start when they provided care before taking her to the hospital.

A.   Yeah, I wasn't talking to anybody besides the cops.

Q.   So the paramedics eventually took Tiffany to St. Rose; is that correct?

A.   Yes.

Q.   Do you recall how much time they spent administering medical care at your house before they

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 155

Q.   During your time at the fire department, did you feel that there was an expectation to kind of look the other way at misconduct?

A.   Yeah.

Q.   And can you tell me, you know, more about kind of what had formed that expectation?  How did you come to that conclusion?

A.   I mean, there's a lot of infidelity on the fire department.  Guys know about other guys' girlfriends, you know.  Nobody says anything.  Yeah, that's just the nature of, you know, you've got your brother's back type of environment.

Q.   Okay.  I'm going to give you Exhibit 42.

(Exhibit 42 was marked for identification.)

BY MS. JORGENSEN:

Q.   These are also pictures from the Station 51 inspection.

A.   Uh-huh.

Q.   Have you seen this section of wall before?

A.   Yes.

Q.   Have you seen -- I'll call it a list for now.  Have you seen a list like this in other fire stations in North Las Vegas?

A.   No.

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 160

closest friends, you know, I may have told them,

yeah, I did molly before.  And then you know, they

said, yeah, me too.  I don't know, though.

Q.   Did you, you know, prior to Tiffany's

death, did you feel safe that you wouldn't get in

trouble for using illegal or illicit drugs with the

fire station?

A.   As long as I didn't get in an accident.

Q.   Did you ever get the impression that, you

know, as long as you didn't get in an accident or

something like that, illicit drug use was kind of --

it was looked the other way at?

A.   I mean, it was kept very hush hush, so...

Q.   But amongst your kind of -- the group that

we've been talking about today, including Defendant

Robison, it was -- it was known?

A.   I'm sorry, can you rephrase that?

Q.   So as far as, you know, any illicit or

illegal drug use as far as, you know, the group that

we've talked about today that you would go out with

and including Defendant Robison, that use was known

about?

A.   Oh, known about?

Q.   Yeah.

A.   Amongst us?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 183

03:43 mean, there may have been times where someone was conscious and, you know, maybe their family called 911, you know.

Q. Okay. You said earlier that you administered Narcan five times?

A. Probably.

Q. That was your estimate. I get it's an estimate.

A. Yeah.

Q. Of those five, did any of them refuse hospitalization?

A. They were unconscious.

Q. You said earlier about your Narcan training that you were never trained that it could wear off before the underlying intoxicant wore off?

A. Correct.

Q. You didn't know that?

A. Correct.

Q. You thought -- on February 22nd, 2020, you thought when you administered Narcan to Ms. Slatsky and she recovered that that was it, she'd be fine?

A. Correct.

Q. Ms. Slatsky was the only patient that you administered Narcan to that you did not take to a hospital, right?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 188

Q.   We've heard testimony in this case that apart from money, Ms. Slatsky got drugs from her clients at Spearmint Rhino.  Are you aware of that?

A.   I don't think she ever actually did.  But she had one client that she had text messaged about getting ketamine, but that was the only thing I know of.

Q.   You're not aware of any other drugs that she got?

A.   No.

Q.   So these -- we talked a lot about the drugs that you procured from others.  Are you aware if Ms. Slatsky ever procured any drugs and brought them into your apartment?

A.   Not that I recall.

Q.   No cocaine?

A.   No.

Q.   No MDMA?

A.   No.

Q.   No morphine?

A.   No.

Q.   Before you met her, did she ever tell -- strike that.

        Did she ever tell you that before you met she had taken illegal or illicit drugs?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 189

A.    She told me she never had.

Q.    You've talked to us about these -- a few instances where you shared and took molly or mushrooms or cocaine with your friends, correct?

A.    Correct.

Q.    Was Ms. Slatsky present and did she take those drugs with your friends?

A.    Yes.

Q.    Every time that you've told us today about instances in which you took MDMA or mushrooms or cocaine or anything else illegal or illicit, she was there and did it, too?

A.    Every time, I mean, I did it.

Q.    Every time?

A.    I believe so.

Q.    I just want to understand about the drugs at the party.  So the party, the tracksuit party.  So at the tracksuit party, you said earlier you brought cocaine, mushrooms, and MDMA, right?

A.    Correct.

Q.    And then in response to my questions, you said there might have been morphine in that bag?

A.    Yeah.

Q.    But you didn't bring it for people to take at the party, right?

did not help.  She continued to appear that she was starting to overdose, as she seemed out of it and was slurring her words."

And that's what you've said today, right?

A.    Yeah.  The chips didn't help with her stomach, but obviously that wasn't -- but that was before.  You know, the chips was at 4:00 o'clock, around 4:00 o'clock.

Q.    Okay.

A.    Her slurring her words was later in the evening.

Q.    The chips were before she took the morphine?

A.    Right.  Right.

Q.    Okay.  The chips were to treat the acid reflux?

A.    Yes.  Yeah.

Q.    "The husband drove the decedent to North Las Vegas Firehouse 51 to get Narcan.  He stated that he chose to drive to the fire station rather than go to a hospital that was closer or call 911 because hospitals would not have taken the decedent as she was still breathing, still had a pulse and was aroused when he would rub her leg."

A.    Right.  I thought we would just be in a

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 207

waiting room all night with nothing really happening.

Q. Okay. You didn't mean to convey that the hospital would turn her away, right?

A. No.

Q. They would have allowed her to stay there?

A. Yeah. Absolutely. I felt at that time with her condition at the time, that we would just be in a waiting room waiting to be seen and she -- you know, that was my opinion at the time.

Q. "He stated that he did not think the decedent was actively overdosing and he wanted to give the Narcan so he would not have to worry about her overdosing throughout the night."

Is that what you said to the investigator?

A. I mean, I thought that she was having symptoms of an overdose, but not a deathly one at the time.

Q. In your training as an EMT paramedic, are there overdoses that aren't deadly?

A. Yeah. I mean, anytime you take more than -- if you have undesired effects of medication, then it's an overdose.

Q. "When they arrived at the fire station, he went into the fire station and left the decedent in the front passenger seat of his truck. He grabbed

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 215

paramedic.  Not overdoses, but just drug-involved issues.  You don't get in trouble.  They don't give out your information to your employer.  I was never concerned about that at the time.

Q.   You felt that you would not be in trouble with your employer if you instead of driving to Firehouse 51 you had driven her to St. Rose Hospital right around the corner, taken her into the emergency room and said, hey, I think my wife might be overdosing, can she get some treatment here, that you wouldn't have been concerned about your job?

A.   No.

MR. FREEMAN:  That's all I have.

EXAMINATION

BY MR. PRUITT:

Q.   I'm William Pruitt.  I'm counsel for Mr. Robison.

How are you doing?

A.   Good.  I'm all right.  Not my best day, but I'm all right.

Q.   Long day, right?

A.   Yeah.

Q.   All right.  Not a lot of follow-up, but I have some.  Okay?

Christopher Candito ~ January 25, 2024
* * * Videotaped Deposition * * *

Page 281

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter of the State of Nevada, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given to the best of my ability.

Further, that before completion of the proceedings, review of the transcript [  ] was [ X ] was not requested pursuant to NRCP 30(e).

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: February 6, 2024

_____
GALE SALERNO, RMR, RVR-MS, CCR #542